792 A.2d 463 (2002)
348 N.J. Super. 466
Ellen BROWN, Plaintiff-Respondent,
v.
James BROWN, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 20, 2001.
Decided February 28, 2002.
*465 Sheldon A. Weiss and Richard Diamond, Millburn, argued the cause for appellant (Diamond & Diamond, attorneys; Mr. Weiss, of counsel and on the brief; Mr. Diamond, on the brief).
Howard B. Felcher, New York, NY, argued the cause for respondent.
Before Judges CUFF, WECKER and WINKELSTEIN.
*464 The opinion of the court was delivered by WECKER, J.A.D.
Defendant James Brown ("James") appeals from the financial terms of a divorce judgment, challenging the amounts awarded to plaintiff Ellen Brown ("Ellen") as permanent alimony, child support, equitable distribution, counsel fees, and expert witness fees. In this appeal, we hold that under the rationale of Balsamides v. Protameen Chemicals, Inc., 160 N.J. 352, 368, *466 734 A.2d 721 (1999), and Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 397, 734 A.2d 738 (1999), which adopt the position of the American Law Institute as set forth at 2 ALI Principles of Corporate Governance § 7.22(a) and comment e thereto, neither marketability nor minority discounts apply to the valuation of defendant's 47 ½% interest in a closely-held corporation for purposes of equitable distribution. For this and other reasons, we remand for reconsideration and further findings with respect to the equitable distribution of James's interest in his family's business, as well as the counsel fee and experts' fee awards to Ellen.
We briefly summarize the relevant background. The parties were married on August 21, 1975, when James was twenty-two years old and Ellen was twenty-three. After twenty-two years of marriage, the parties separated in October 1997. The divorce complaint was filed in November 1997. The trial took place on five days between June and November 1999, and the trial judge issued a thirty-two-page written decision on July 20, 2000. The judgment of divorce was entered on September 7, 2000.
When the parties married, James had recently graduated from college and immediately went to work in his family's wholesale florist business, Union County Florist Supplies, Inc. (Florist), eventually acquiring a 47 ½% interest in the firm and becoming an officer. He has continually been employed by Florist. Ellen worked full-time as a dental assistant during virtually all of the marriage and continues in the position she has held for many years. The parties' only child, Matthew, was born September 6, 1985 and adopted as an infant. The parties agreed to joint legal custody of Matthew, with Ellen as the primary residential custodial parent.
The parties owned their own home in Bloomfield, which they improved over the years. They sent Matthew to a private school, Montclair Kimberley Academy, as well as to summer camp; generally took vacations three times per year; and each drove a leased car supplied by Florist and replaced every three years. In 1998, James reported W-2 income of $75,000, 1099 income of $75,000, and interest income of $7,131, all from Florist, and "passive income" of $8,514 from both Florist and PRJ, a real estate partnership in which James, his brother Richard, and his mother Patricia each held a one-third interest. Thus James's income reported in 1998 was in excess of $165,645. Ellen reported W-2 income of $27,194.99 for 1998. Each party's reported income in 1997 and 1996 was similar to that reported for 1998.
With respect to equitable distribution, the trial judge adopted Ellen's expert's valuation of James's interest in Florist as $561,925, which excluded discounts for lack of marketability and lack of control that James's expert included, and which omitted any reduction for James's claim that he received his interest as a gift. The judge awarded Ellen 40% of James's interest, $225,000, in equitable distribution. The parties agreed on the appraised value of PRJ's real property and the partnership's equity therein. After rejecting James's claim that his one-third interest was a gift and therefore immune from equitable distribution, the judge awarded Ellen $67,000, 40% of James's share of the equity in the property.
The parties stipulated the fair market value of the marital residence at $182,500 and the mortgage balance at $94,000. The judge awarded James $35,500, approximately 40% of the equity in the house. Ellen received title to the house subject to the mortgage and responsibility for repairs *467 to the roof and windows and for water damage,[1] thus receiving net value of approximately $49,700.
In addition to the house and to James's holdings in Florist and PRJ, the parties' assets subject to equitable distribution and valued as of the date of the complaint, were:
James's Paine Weber Investment Account $27,000[2]
James's Paine Weber Retirement Account $29,536.82[3]
Ellen's IRA Account $ 6,464
Ellen's Employer's Pension Account $37,284
Household Furnishings $15,000
Ellen's Jewelry $15,320
These assets were ordered divided equally between the parties. In awarding Ellen 50% of the filing-date balances in James's Paine Weber accounts, plus "accumulated dividends, interest and growth ... to the date of distribution ...," the trial judge found that although James had invaded those accounts during the course of the litigation with permission of the court, the orders allowing those withdrawals had reserved a final accounting to the conclusion of trial, and James "had the financial ability to pay the attorney fees, reasonable Bar Mitzvah costs; camp and temple expenses from his income and/or from his mother who paid the camp and temple costs prior to the parties' marital problems."[4] The judge applied the following legal principles:
Marital liabilities as well as marital assets must be considered when awarding equitable distribution. Monte v. Monte, 212 N.J.Super. 557, 515 A.2d 1233 (App.Div.1986). "However, if the debt resulted because the husband intentionally dissipated marital assets such intentional dissipation is no more than a fraud on marital rights and the debt will not be charged to the wife." Monte, supra. If the defendant depleted marital assets to discharge his obligations, he would be charged with the amount of the depletion. Weiss v. Weiss, [226 N.J.Super. 281, 543 A.2d 1062 (App.Div.1988).] Moreover, a party may not use marital assets to defray support from current earnings and thereby defeat a spouse's interest in the asset at the time of equitable distribution. Lynn v. Lynn, 165 N.J.Super. 328[, 398 A.2d 141] (App.Div.1979).
The parties' only marital debts as of the filing date were found to be an $18,000 credit card debt and James's $1,500 dental bill. The trial judge rejected James's claim that he owed his brother $2,300 and his mother $21,850 as a result of loans he claimed he needed in order to comply with his support obligations. The total $19,500 debt subject to equitable distribution was allocated 24% to Ellen and 76% to James, thus rejecting James's contention that the credit card debt was not marital. As James summarizes the award of equitable distribution, his net cash obligation to Ellen under the divorce judgment is $261,500.
*468 With respect to alimony, the judge properly considered the statutory factors, N.J.S.A. 2A:34-23b; the parties' marital standard of living, consistent with the subsequent decision of the Supreme Court in Crews v. Crews, 164 N.J. 11, 751 A.2d 524 (2000); the parties' projected budgets; and their respective earnings and earnings potential. After finding that Ellen had little likelihood of substantially increasing her earnings in the future, whereas James had the potential for increasing his income from Florist, the judge awarded Ellen "permanent alimony in the amount of $62,500 payable $1,200 weekly," consistent with our subsequent decision in Cox v. Cox, 335 N.J.Super. 465, 762 A.2d 1040 (App.Div.2000). James did not dispute the appropriateness of a permanent alimony award to Ellen, but only the amount. In setting the amount of alimony, the judge noted that although James's "household consists of another `family' which [he] is substantially subsidizing from his current income," he did not provide any information respecting his contribution to his new partner's living expenses and those of her children.
The judge calculated James's child support obligation under the Child Support Guidelines at $194 per week. Matthew's private school expenses of $16,500 per year were allocated 25% to Ellen and 75% to James, with James to be responsible for 100% of Matthew's approximately $6,700 in annual hockey expenses and summer camp. James was to provide medical and dental coverage for Matthew, and unreimbursed expenses above $250 were to be allocated 44% to Ellen and 56% to James.
James was to provide security for alimony and child support by maintaining life insurance in the amount of $500,000 with plaintiff as the irrevocable beneficiary to secure his alimony obligation, and by maintaining $150,000 with plaintiff as trustee for Matthew to secure child support until his emancipation. The insurance obligation is not challenged on this appeal.
Finally, the judge cited R. 5:3-5(c), Williams v. Williams, 59 N.J. 229, 281 A.2d 273 (1971), and D'Onofrio v. D'Onofrio, 200 N.J.Super. 361, 491 A.2d 752 (App.Div.1985), as the basis for a discretionary award of counsel fees to Ellen based upon "the plaintiff's needs, the defendant's financial ability to pay, and the parties' good faith in instituting or defending the action." In addition to the disparity in income between the parties, the judge emphasized as a rationale for the fee award
that a sizeable portion of the legal work performed by the plaintiff's attorney was the result of the defendant's bad faith in raising or prolonging issues related to income, alimony, child support, and equitable distribution .... [and finding] that the defendant acted in bad faith in misrepresenting his income, his "immunized" family business assets (subject to equitable distribution); his claim of business discounts not permitted in equitable distribution evaluations without exceptional circumstances and his use of marital assets to pay "expenses" with the intent to deprive the plaintiff of her right to equitable distribution....
The judge found Ellen's attorney's certification of services reasonable and necessary both in the hourly rates and time expended, and awarded plaintiff $40,250 (less $7,500 previously paid by defendant pendente lite) against the $65,987.50 claimed by her attorney for legal fees plus $1,894.90 costs. The judge also awarded Ellen $18,500 (less $3,500 previously paid pendente lite) against her accounting expert's total invoice of $25,050.90, plus $580.90 costs and noted the balance owed *469 to defendant's accounting expert, $23,000,[5] from which he "infer[red] that the plaintiff's expert's fees were both reasonable as to time and hourly charges."
I.
We do not interfere with the judge's determinations respecting alimony, child support, or the equitable distribution of assets other than defendant's interest in Florist. The judge's findings and allocation of marital assets and liabilities,[6] other than Florist, are supported by substantial credible evidence, and we defer to those findings. See Pascale v. Pascale, 113 N.J. 20, 33, 549 A.2d 782 (1988); Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974); Borodinsky v. Borodinsky, 162 N.J.Super. 437, 443-44, 393 A.2d 583 (App.Div.1978). The trial judge's determinations of alimony and child support are likewise supported by credible evidence in the record, and we defer to those determinations. We recognize however, the interrelationship of equitable distribution, alimony, child support, and fee awards. See John D. Miller v. Margaret C. Miller, 160 N.J. 408, 420, 734 A.2d 752 (1999); Gladys Miller v. Jay Miller, 97 N.J. 154, 171, 478 A.2d 351 (1984); Stamberg v. Stamberg, 302 N.J.Super. 35, 42, 694 A.2d 592 (App.Div.1997); Koelble v. Koelble, 261 N.J.Super. 190, 192, 618 A.2d 377 (App.Div.1992); Slayton v. Slayton, 250 N.J.Super. 47, 50, 593 A.2d 365 (App.Div.1991). We therefore leave it to the discretion of the Family Part Judge on remand to reconsider alimony and child support determinations in light of any significant changes in equitable distribution to Ellen arising from James's holdings in Florist. See Dotsko v. Dotsko, 244 N.J.Super. 668, 682, 583 A.2d 395 (App. Div.1990); Borodinsky v. Borodinsky, 162 N.J.Super. at 448, 393 A.2d 583.
II.
We now address equitable distribution with respect to James's 47 ½% interest in Florist. In this appeal, James challenges the trial judge's refusal to credit evidence that his interest was a gift from his parents and to exclude from the marital estate that portion of James's interest in Florist, representing the value of his shares as of the various dates when they were received from his father or his mother. James concedes that as an active asset, the increase in the value of shares that he received as gifts would be subject to equitable distribution. Scherzer v. Scherzer, 136 N.J.Super. 397, 400, 346 A.2d 434 (App. Div.1975), certif. denied, 69 N.J. 391, 354 A.2d 319 (1976). James also challenges the trial judge's adoption of Ellen's expert's valuation and rejection of James's expert's valuation, particularly the judge's holding that neither marketability nor minority discounts were appropriate in evaluating James's interest in Florist. Finally, James challenges Ellen's entitlement to 40% of this marital asset because she did not play an active role in the business.
A.
Each party presented the testimony of a certified public accountant with expertise in business valuation. Ellen's expert was Stephan C. Chait, C.P.A., of the firm Morrison & Company. James's expert was Kalman A. Barson, C.P.A., of the firm Rosenberg Rich Baker Berman & Company. *470 Each expert testified from his own written report, which was admitted into evidence.
Chait valued the entire business of Florist, as of the date of the complaint, at $1,183,000, and James's 47 ½% interest at $561,925, taking no discount for marketability or lack of control and assuming that the full value of James's interest was subject to equitable distribution. Barson valued James's 47 ½% interest in the business as of the date of the complaint at $339,000, after applying discounts of 25% for lack of marketability and 15% for lack of control. Using the same methodology and the same discounts, Barson also valued the shares James acquired from his parents as of the six separate dates of acquisition between 1980 and 1996. Barson then subtracted the $121,000 value he placed on James's shares when acquired, from the $339,000 value he had placed on James's shares at the date of the complaint, leaving $238,000 as the incremental value of James's shares to be included in the marital estate. Neither Chait nor Barson offered an opinion with respect to whether the shares were gifts; each adopted the assumption of the party who retained him.
As the Court recently observed in Balsamides v. Protameen Chemicals, Inc., 160 N.J. 352, 368, 734 A.2d 721 (1999) ("Balsamides"), and Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 397, 734 A.2d 738 (1999) ("Lawson"), valuation is not an exact science. See also Bowen v. Bowen, 96 N.J. 36, 44, 473 A.2d 73 (1984) (quoting Lavene v. Lavene, 162 N.J.Super. 187, 193, 392 A.2d 621 (Ch.Div.1978) (on remand) (Lavene II)); John R. MacKay, II, 2 New Jersey Business Corporations § 14-6(d)(1) (2d ed. 1996) ("MacKay"). Careful analysis on a case by case basis is required, with sensitivity and adjustment for the particular circumstances and the flexibility to deal with extraordinary circumstances. In Lavene v. Lavene, 148 N.J.Super. 267, 372 A.2d 629 (App.Div.), certif. denied, 75 N.J. 28, 379 A.2d 259 (1977) (Lavene I), where we held that the husband's 43% interest in a closely-held corporation "constitute[d] a distributable asset" and remanded for valuation, Judge Pressler noted:
There are probably few assets whose valuation imposes as difficult, intricate and sophisticated a task as interests in close corporations. They cannot be realistically evaluated by a simplistic approach which is based solely on book value, which fails to deal with the realities of the good will concept, which does not consider investment value of a business in terms of actual profit, and which does not deal with the question of discounting the value of a minority interest.
[Id. at 275, 372 A.2d 629.]
With the exception of brief mention in Bowen v. Bowen, 96 N.J. at 51-52, 473 A.2d 73, where the parties' experts disagreed respecting the application of a minority discount to the husband's minority interest in a closely-held corporation, and where the wife's expert testified to having "built in a discount" by lowering the multiple of earnings used to determine value; in Lavene I, quoted above; and in Lavene II, 162 N.J.Super. at 202, 392 A.2d 621 ("It would not be appropriate to discount defendant's interest in the corporation, notwithstanding the fact that he has only a minority interest"), we find no reported case in New Jersey that addresses the applicability of either minority or marketability discounts in valuing shares in a closely-held corporation for purposes of equitable distribution.
A trial court is free to accept or reject the testimony of either side's expert, and need not adopt the opinion of either expert in its entirety. Carey v. Lovett, 132 N.J. 44, 64, 622 A.2d 1279 (1993). In fact, *471 the trial judge adopted the Chait valuation with the following explanation:
The court finds that the conclusions of Stephan C. Chait [are] more credible than the conclusions of Kalman A. Barson based on the assumptions each made in arriving at their respective conclusions. After reviewing the testimony of Mr. Barson and the documentary evidence relied upon by him and evaluating his demeanor and credibility as to evaluation conclusion, the court finds his opinion of value not sufficiently reliable and too speculative as to his assumptions to be acceptable. While the court acknowledges the approaches used by both experts as methods of evaluation, the court accepts Mr. Chait's valuation conclusions as more credible as it related to the financial analysis of "Florist"; his adjustments; officer compensation; reasonable compensation; normalization earnings; tax rate; discount rate; discretionary expenses, disuse of discounts, and disuse of "gifting".
Both experts took similar approaches to valuing the business. Each used a weighted average of the results of two valuation methods, the market approach (comparable sales of similar companies) and the capitalization of income approach (placing a present value on the anticipated future income stream). Both gave the income approach substantially more weight than the market approach, Chait using relative weights of 80% for income and 20% for market (a four-to-one ratio), and Barson using 75% for income and 25% for market (a three-to-one ratio). The experts differed somewhat in the capitalization rates they adopted in their income approach valuations (20% for Chait and 25% for Barson). The inverse of the capitalization rate is the multiple applied to a projected future income stream to place a value on the business. Thus Chait's 20% capitalization rate translates to a multiple of five times annual income, whereas Barson's 25% capitalization rate translates to a multiple of four.
Chait and Barson also differed somewhat in the extent to which they added back to income excess business expenses of the company (largely for excess officer compensation and personal expenses paid for officers) to calculate true net income. It is plain, however, that the magnitude of the disparity between the values these two experts placed on James's interest in Florist arose largely out of their respective approaches to the two legal issues we have identified(1) application of marketability and minority discounts and (2) gifting.
When we eliminate the marketability and minority discounts from Barson's valuation, we find the two experts' conclusions as to the value of James's interest as of the filing date substantially closer than originally appears. Whereas Chait valued James's interest at $561,925, Barson's value, if we add back the twenty-five percent marketability discount and the fifteen percent minority discount that he applied, would have been $500,000.[7] The difference *472 between Ellen's 40% share under Chait's valuation (rounded to $225,000) and under Barson's valuation (rounded to $200,000) is accounted for by the several judgment calls involved in each expert's approach. We are hard-pressed to interfere with the trial judge's adoption of Chait's judgments, separate and apart from the gift issueon which each expert merely adopted the assumption of his own client.
The trial judge's overall conclusion with respect to the weight and credibility to be given to the experts' respective opinionsthat Chait's opinion should be adopted in its entirety and Barson's disregardedactually reflects the judge's view of the discounting and gift issues, which we now address.
B.
James maintains that the credible evidence in the record does not support the trial judge's conclusion that James failed to prove that his interest in Florist was acquired by gift. We agree. The trial judge correctly placed upon James the burden of establishing that his interests in Florist and in PRJ were exempt in whole or in part as gifts. See Pascale v. Pascale, 140 N.J. at 609, 660 A.2d 485; Landwehr v. Landwehr, 111 N.J. 491, 504, 545 A.2d 738 (1988); Painter v. Painter, 65 N.J. 196, 214, 320 A.2d 484 (1974); Dotsko v. Dotsko, 244 N.J.Super. at 676, 583 A.2d 395; Weiss v. Weiss, 226 N.J.Super. 281, 291, 543 A.2d 1062 (App. Div.), certif. denied, 114 N.J. 287, 554 A.2d 844 (1988). But the judge ignored significant evidence that supports the claimed gifts of 47 ½ shares in Florist, when he concluded that James "failed to produce any evidence of an unequivocal donative intent on the part of the donor, actual or symbolic delivery of the subject matter of the gift, and an absolute and irrevocable relinquishment of ownership by the donor," citing In re Dodge, 50 N.J. 192, 234 A.2d 65 (1967). The judge found that James's father "continued to exercise `ownership' control" over both the business itself and the brothers' relationship as co-owners "long after he transferred his shares of stock." That analysis might apply to a dispute between the sons and their parents over ownership; it does not assist us in determining whether James acquired his 47 ½ shares as gifts from his parents or in exchange for past or future services.
James, his brother Richard, and his mother each testified that the elder Browns, as the original owners of all 100 shares of Florist, intended to give the business to their sons; gave their shares away without compensation as part of their own estate plan; and never intended anyone else, including their daughters-in-law, to own the business. In light of that testimony, which was not contradicted by Ellen, it is impossible to accept the trial judge's conclusion that James offered no evidence of a gift. On the contrary, we are satisfied that James met his burden of proving by a *473 preponderance of the evidence that his shares were gifts, and that their values when received must be excluded from equitable distribution.
In reaching that conclusion, we note the absence of any substantial evidence to rebut James's evidence that his shares were received as gifts from his parents as part of their own estate planning. Ellen argues on appeal that modest salary payments to James's father and mother after the stock transfers, payments that were unrelated to their actual work in the business, contradict the claimed gifts. We fail to see the logic in that argument. Moreover, our conclusion is influenced by Ellen's acquiescence in the gifting plan. The record establishes that the elder Browns gradually divested themselves of their 100 shares in Florist by directly and indirectly giving an equal number of shares to James and to Richard on six separate dates, totaling 47 ½% to each.[8] It is undisputed that their father, Albert Brown, first transferred twenty-two shares to each of them; that in 1990, 1991 and 1992, Patricia Brown, their mother, transferred three shares each to James, to Ellen, to Richard, and to Richard's wife, Gloria; that each of the wives then transferred the shares she received to her husband; that in 1993, Patricia Brown transferred one share each to James, Ellen, Richard and Gloria, and again Ellen transferred the share she received to James, and Gloria transferred her share to Richard; and finally, that in 1996, Patricia Brown transferred 3 ½ shares each to James and to Richard.
Barson admitted that there was no evidence that either James's father or his mother ever filed a gift tax return, which would have been required for any gift with a value in excess of $10,000. He also admitted that Patricia Brown's transfers to James's and Richard's wives were intended to keep the gifts under the maximum allowed free of gift tax. Whether James's parents breached any tax reporting or tax payment obligation arising from those transfers does not affect the character of the transfers as between parent and child, absent evidence that the shares were acquired as anything other than gifts.
The value of James's shares as of the dates they were received as gifts must be deducted from the complaint-date value to calculate that portion of James's interest in Florist that is subject to equitable distribution. We stress that the valuation of Florist, and thus of the shares when received by James, must be determined in accordance with our holding that neither marketability nor minority discounts are appropriate. In other words, the valuation approaches for each date must be consistent with the approaches taken for the complaint-date valuation.
In light of our conclusion respecting the gift issue, James's litigation posture on that issue does not support the finding of bad faith on his part nor a lack of credibility on the part of his expert.
C.
James contends that the trial judge erred in rejecting the applicability of marketability and minority discounts in valuing his interest in Florist. We disagree.
The Supreme Court recently addressed the applicability of marketability and minority discounts in valuing a less than controlling interest in a closely-held corporation. See Balsamides, 160 N.J. at 352, 734 A.2d 721, and Lawson, 160 N.J. at 383, 734 A.2d 738. "A minority discount adjusts for lack of control over the business *474 entity on the theory that non-controlling shares of stock are not worth their proportionate share of the firm's value because they lack voting power to control corporate actions.... A marketability discount adjusts for a lack of liquidity in one's interest in an entity, on the theory that there is a limited supply of potential buyers for stock in a closely-held corporation." Lawson, 160 N.J. at 398-99, 734 A.2d 738. Whether marketability or minority discounts are appropriate to the valuation of a less than controlling interest in the entity are questions of law which we review de novo, giving no special deference to the trial judge's determination. Balsamides, 160 N.J. at 372-73, 734 A.2d 721; Lawson, 160 N.J. at 398, 734 A.2d 738.
The general rule we deduce from Lawson and Balsamides is that in a statutory appraisal for purposes of determining the fair value of shares owned by a dissenting shareholder, N.J.S.A. 14A:11-1 to -11 (as in Lawson), or for valuing shares in a court-ordered buy-out resulting from an oppressed shareholder situation, N.J.S.A. 14A:12-7(1)(c) (as in Balsamides), neither a marketability nor a minority discount should be applied absent extraordinary circumstances. See MacKay § 14-6(d)(2)(d) (Supp. 2001). The functional similarity of these two discounts has been recognized by the American Law Institute. 2 ALI Principles of Corporate Governance § 7.22(a) ("ALI Principles").
Although in Balsamides the Court found a 35% marketability discount appropriate, whereas in Lawson the Court disallowed any discount, the Court enunciated its application of "the same guiding principle" in both cases"a marketability discount cannot be used unfairly by controlling or oppressing shareholders to benefit themselves to the detriment of the minority or oppressed shareholders." Lawson, 160 N.J. at 407-08, 734 A.2d 738; accord Balsamides, 160 N.J. at 378-79, 734 A.2d 721. The unfairness of using those discounts lies in the potential for depriving minority shareholders of the full proportionate value of their shares and enriching majority shareholders by allowing a buy-out of minority interests at bargain prices. Lawson, 160 N.J. at 402, 734 A.2d 738.[9]
In Balsamides, the extraordinary circumstance that warranted use of a marketability discount was that it was the oppressing 50% shareholder who was to acquire the shares of the oppressed 50% shareholder, and equity demanded that the oppressor not be rewarded for his conduct by allowing a buy-out at a discounted price. In Lawson, the Supreme Court found no comparably extraordinary circumstance and rejected use of the discounts where discounting would have allowed the oppressive majority shareholder to buy out minority owners at less than full value.
The ALI's rationale for the fair value, no-discount rule, a rationale adopted in Lawson and Balsamides, is that neither the dissenting (minority) shareholder, nor *475 the oppressive (majority) shareholder, nor a veto-wielding (50%) shareholder, can be allowed to exploit the very situation that triggered the right to an appraisal, thereby capturing more than a proportionate share of the corporation's value and depriving other shareholders of their fair share.
In Lawson, the Court expressly adopted the approach of § 7.22(a) of the ALI Principles:
"The fair value of shares [subject to statutory appraisal rights] should be the value of the eligible holder's ... proportionate interest in the corporation, without any discount for minority status or, absent extraordinary circumstances, lack of marketability."
[160 N.J. at 403, 734 A.2d 738.]
That position is elaborated in comment e to ALI Principles, § 7.22(a):
Some decisions have upheld the subtraction of a minority discount from the value of shares held by small stockholders on the theory that non-controlling stock is worth less than its proportionate share of the corporation's fair value. Other decisions have accepted a functionally similar adjustment to reflect the non-marketability of minority shares. However, both Delaware and Maine have recently and properly rejected the use of any such discount. See Cavalier Oil Corp. v. Harnett, 564 A.2d 1137 (Del.1989); In re Valuation of Common Stock of McLoon Oil Co., 565 A.2d 997 (Me.1989). See Reporter's Note 4. Section 7.22(a) follows these jurisdictions in requiring the appraisal court to value the firm as a whole, not specific shares, and to allocate that value proportionately, absent extraordinary circumstances. Any contrary rule would require the court to undertake a complicated and ultimately speculative inquiry, which could produce disparate awards depending on the number of shares held by otherwise similarly situated dissenting shareholders. Similarly, the status of shares as "restricted securities" for purposes of the federal securities laws should not affect their valuation under the proportionate interest standard of § 7.22(a).
It has been said that the very purpose of the appraisal remedy for dissenting shareholders would be undermined by application of a minority discount to the value of their shares. Robert B. Heglar, Rejecting the Minority Discount, 1989 Duke L.J. 258, 266-75 (1989). There is a recognized risk of double-counting by an expert, that is, of duplicative reductions in the value of a minority interest in a closely-held business, as a result of increasing the capitalization rate (and decreasing the valuation multiple) to account for limited marketability, and then in addition applying a "marketability discount" to the value derived from capitalizing income. See Balsamides, 160 N.J. at 379-81, 734 A.2d 721; MacKay, § 14-6(d)(2)(d) at 36 (Supp. 2001).
In his capitalization of income approach to valuation, Chait took into account an "equity risk" over a "safe," "risk-free" investment, such as a twenty-year United States Treasury bond; a "small company risk" (based upon a comparison of small and large company public stocks); and a "specific company risk," all of which he factored into his determination that a twenty percent capitalization rate was appropriate. Barson's income approach to valuation also took into account both small company risk and a "small company risk premium" when he determined to use a twenty-five percent capitalization rate. Thus the additional twenty-five percent discount Barson applied for lack of marketability appears to double-count the same risk, a factor that further justifies eliminating that discount.
*476 Although the Court's holdings in Lawson and in Balsamides directly addressed the use of a marketability discount, in each case the Court also discussed the use of a minority discount. Lawson, 160 N.J. at 401-03, 734 A.2d 738; Balsamides, 160 N.J. at 373-75, 734 A.2d 721. We recently denied the application of both marketability and minority discounts where no extraordinary circumstances were proven. Casey v. Brennan, 344 N.J.Super. 83, 780 A.2d 553 (App.Div.), certif. granted, 170 N.J. 389, 788 A.2d 773 (2001), and certif. denied, 170 N.J. 389, 788 A.2d 773 (2001). We held in Casey that dissenting shareholders exercising their right to a statutory appraisal pursuant to N.J.S.A. 14A:11-7(1), as well as those dissenting shareholders whose rights on being cashed out arose under common law, all were entitled to their proportionate shares of the value of the whole corporation, and not merely a discounted price for their minority holdings. 344 N.J.Super. at 111-12, 780 A.2d 553.
In Casey, after discussing the holdings of Lawson and Balsamides with respect to the marketability discount, and relying in part upon the reasoning of the Delaware Supreme Court in Cavalier Oil Corp. v. Harnett, 564 A.2d 1137, 1144 (Del. 1989) (the object of the statutory appraisal is "to value the corporation itself, as distinguished from a specific fraction of its shares as they may exist in the hands of a particular shareholder"), we found "no reason to distinguish, for these purposes between marketability and minority discounts and ... conclude[d] that minority discounts likewise are not to be applied in a valuation proceeding." 344 N.J.Super. at 112, 780 A.2d 553.
Statutory appraisal rights accorded to dissenting shareholders in New Jersey (and in most states) include the right to a determination of the "fair value" (not "fair market value") of their shares. N.J.S.A. 14A:11-3; see Bobbie J. Hollis, II, The Unfairness of Applying Lack of Marketability Discounts to Determine Fair Value in Dissenter's Rights Cases, 25 J. Corp. L. 137, 139 (1999), explaining the distinction between "fair value" and "fair market value":
"Fair value" is not the same as, or short-hand for, "fair market value." "Fair value" carries with it the statutory purpose that shareholders be fairly compensated, which may or may not equate with the market's judgment about the stock's value. This is particularly appropriate in the close corporation setting where there is no ready market for the shares and consequently no fair market value.
A closely-held corporation is one that has few shareholders and little market for the stock, or one that has an integration of ownership and management. When appraising shares of a close corporation, fair value cannot be fairly equated with the company's fair market value. Close corporations by their nature have less value to outsiders, but at the same time their value may be even greater to other shareholders who want to keep the business in the form of a close corporation.
[Footnotes omitted.]
The "fair value" concept is inherently inconsistent with discounting value to reflect limited marketability. That which has been labeled a "marketability discount" reflects the theoretically limited market for the sale of a privately-held, small business. That which has been labeled a "minority discount" reflects a theoretically more limited market for sale of a non-controlling interest in such a business. The significance of a limited market is that the asset is illiquid. Both discounts represent an attempt to account for the *477 fact that unlike shares in a publicly-traded company, shares in a closely-held corporation have limited liquidity.
But liquidity is of little consequence here. As between James and his brothers, the only other shareholders, there is no evidence of a contemplated sale of all or part of the business, forced or otherwise. All of the evidence supports the likelihood that the business will continue under the present ownership for the foreseeable future, with James and Richard each continuing to be the active owners and officers, each holding 47 ½% of the outstanding shares, and Gilbert holding the remaining 5%.[10] The distinction between fair value and fair market value appears to us equally applicable in the valuation of one spouse's interest in his family's closely-held corporation for purposes of equitable distribution.[11]
Given the Court's adoption of the "proportionate share" approach to valuing the interest held by a dissenting or an oppressed shareholder, any dispute among the existing shareholders would presumably see James either buying out his brothers' interests or selling his own at a proportionate share of fair value, with no discount for lack of control. Indeed, the statutory protections for dissenting shareholders, as interpreted in Lawson, demonstrate that the value of James's minority interest in Florist, vis-a-vis his brothers (the only other shareholders), is protected by the fair value rule itself. That is, if he were to find himself at irreconcilable odds with his brothers, he could force a statutory appraisal in which each bloc would be valued at a proportionate share of the whole.
Unlike Balsamides, Lawson, and Casey, no actual transfer of shares is involved in this equitable distribution case. That distinction makes the marketability discount even less appropriate than in the statutory appraisal or deadlock contexts, since no sale of the business appears likely in the foreseeable future. We see no reason to reward the spouse who holds title to the shares by allowing him to retain the value of the entire bloc at a bargain "price," that is, crediting the non-owner spouse with less than the owner's proportionate share of full value when determining equitable distribution of the marital assets. Here, allowing the marketability or minority discounts would unfairly minimize the marital estate to Ellen's detriment and is inconsistent with the concept of equitable distribution. *478 While "there is no ready market for the shares and consequently no fair market value" of Florist, James's shares in the going concern have value to him and to his co-owners that does not depend upon a theoretical sale to an outsider and has not changed as a result of the divorce complaint or judgment.
The ALI cautions that valuation contexts other than dissenting shareholder appraisal rights, such as tax valuations, may warrant a different approach to discounting, ALI Principles § 7.22, comment e at 325-26. However, we see no reason for a different approach in equitable distribution. Even James's expert, Barson, admitted that the value of a minority bloc of stock is not to be discounted for lack of control under New Jersey's "fair value" statutes. He did not offer any explanation for adopting a different rule for purposes of equitable distribution. While Barson cited a controlling shareholder's "power to change the bottom line" as one rationale for applying a discount here, no single shareholder controlled Florist or its officers' bottom line.
The record before us reveals no extraordinary circumstances related to the operation or control of Florist to warrant a discount from the fair value of the company for lack of marketability, or a discount from the value of James's interest for his minority bloc. Under these circumstances, and consistent with the reasoning of our Supreme Court, we see no reason to reduce the proportionate value of James's 47 ½ shares (47 ½%) for lack of liquidity (marketability discount) or lack of control (minority discount).
Given the purpose of equitable distribution to fairly divide the accumulated wealth of a marital partnership, and that the purpose of valuing the shareholder spouse's interest is to determine the non-owner spouse's fair share of other marital assets; where the shareholder will retain his shares and the divorce will not trigger a sale of those shares, lack of liquidity does not affect the fair value of the minority interest. Neither discount is appropriate.
We therefore find no legal error in the judge's holding marketability and minority discounts inapplicable in this case, and we affirm the trial judge's determination that there are no "extraordinary circumstances" to warrant use of those discounts. However, because there has been little in the way of case law respecting that issue in the context of equitable distribution, we cannot agree with the judge's finding that Barson's use of those discounts or defendant's contentions respecting the discounts amount to "bad faith" as a factor in awarding Ellen professional fees.
D.
We find no merit in James's contention that Ellen is not entitled to 40% of Florist because she was not active in the business. See R. 2:11-3(e)(1)(E). The theory of equitable distribution is that marriage is a partnership whose assets should be fairly and equitably distributed when the partnership breaks up. E.g., Pascale v. Pascale, 140 N.J. at 609, 660 A.2d 485; Portner v. Portner, 93 N.J. 215, 219, 460 A.2d 115 (1983); Rothman v. Rothman, 65 N.J. 219, 229, 320 A.2d 496 (1974). There is ample support for the trial judge's finding that Ellen fulfilled that partnership role:
Although the defendant was the primary wage earner, it is clear that the plaintiff made substantial contributions to both the defendant's earning power and to the acquisition and preservation of the marital property.... In light of both the plaintiff's financial and non-financial contributions, the court finds that she was not only a partner, but an equal force, in the marriage and made substantial contributions *479 to the economic betterment of the parties' marriage.
Indeed, in his written summation, James proposed allocating to Ellen an amount equal to 45% of the $238,000 incremental value that Barson placed upon James's interest in Florist. Allowing Ellen 40% of that portion of James's interest in Florist that is determined to be part of the marital estate is well within a reasonable exercise of judicial discretion, and we will not interfere.
III.
We now address equitable distribution of James's one-third interest in the real estate partnership, PRJ, which owns the property in Linden that is now occupied by Florist. PRJ's three equal partners are James, his brother Richard, and Patricia Brown (James's and Richard's mother).
James contends that his interest in PRJ was received as a gift from his father and is therefore immune from equitable distribution. The trial judge rejected that contention. James argues that the Linden property owned by PRJ was purchased in PRJ's name with the proceeds of the sale of the Staten Island property formerly occupied by Florist and allegedly owned by James's father. We agree with the trial judge that the record does not support that argument.
The testimony and the documentary evidence are inconsistent, and neither supports the gift claim. The RESPA statement for the July 10, 1987 purchase of the PRJ property in Linden reflects a purchase price of $1,099,400, plus closing costs and related expenses that bring the total to $1,115,351. The purchase was financed by PRJ's assumption of an Economic Development Authority (EDA) loan of $602,996, a $300,000 mortgage loan from the seller, and the balance paid in cash. The source of the cash portion of the purchase price is not identified in the record.
The Staten Island property apparently consisted of three parcels, each of which was titled in the name of Florist when it was sold to a third party. Florist sold the first parcel, 87 Grove Avenue, on September 22, 1987, for $285,000 in an all cash sale, two-and-one-half months after PRJ took title to the Linden property. Florist sold the second parcel, 78 Faber Street, for $150,000 on September 1, 1988, receiving $30,000 as a cash deposit and taking back a mortgage to secure the remaining $120,000 due. Florist sold the third parcel, 97-99 Grove Avenue, on January 26, 1996, taking back a mortgage for the entire purchase price, $60,000. These two mortgages are carried as assets on Florist's books.
James himself testified that he considered Florist and PRJ as a single entity.[12] If corporate funds or corporate credit was used to purchase the partnership property, then James's acquisition of a one-third interest in PRJ was not a gift, but a distribution from Florist. Apparently based upon these facts, the trial judge concluded that James "produced no credible evidence as to immunize his interest in PRJ Associates from equitable distribution." In other words, the trial judge found that James did not meet his burden of proving that the real estate purchased by PRJ in 1987 constituted a gift from his father. We defer to that finding, which is supported by the record, and we affirm the trial judge's conclusion that James failed to *480 prove that his interest in PRJ was acquired by gift.
The parties agreed on the equity in the property, and thus on the value of James's one-third share. That share was properly included in the marital estate, and we are satisfied that distributing 40% ($67,000) to Ellen was a reasonable exercise of discretion.
IV.
The trial judge's award of counsel fees and expert witness fees was grounded largely upon a finding of bad faith on James's part in regard to equitable distribution of his interests in Florist and PRJ. Because we do not find support in the record for the judge's findings that James acted in bad faith respecting those two assets, the fee awards must be vacated and considered anew on remand. By vacating these awards, we do not suggest that no fee award to Ellen is appropriate, or that the Court may not have grounds for a substantially similar award. The court must, however, consider all of the Williams[13] factors in light of the entire record and its final decision on all other financial issues.
V.
We reject defendant's request that we exercise our original jurisdiction to determine the disputed valuation issues other than the gift and discounting issues addressed in Parts II B, II C, and III of this opinion. We also reject defendant's request in the alternative that any issues remanded to the Family Part be assigned to a different judge. The mere fact that a judge has issued legal rulings or made factual findings in a case does not warrant reassignment in the event of reversal and remand. However, where findings of credibility respecting the testimony of key witnesses have been made, and where a significant portion of those findings have been found unsupported by the record, fairness dictates a fresh look. See Luedtke v. Shobert, 342 N.J.Super. 202, 219, 776 A.2d 233 (App.Div.2001) ("[I]t would place the court in an untenable position to now have to reevaluate a case in which it had already expressed a preference for one of the experts over the other.")
As we have explained, we view the judge's adoption of Chait's valuation testimony as largely a result of his view of the two legal issues which we have now determined. On balance, we are satisfied that the trial judge will be guided by our decision and can fairly reconsider the valuation of the marital portion of James's interest in Florist, as well as counsel and expert fees. Alimony or child support may warrant modification in light of the final decision on equitable distribution. See Bowen v. Bowen, 96 N.J. at 52-53, 473 A.2d 73; Dotsko v. Dotsko, 244 N.J.Super. at 682, 583 A.2d 395. The trial judge will be in the best position to consider any such modification.
Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
NOTES
[1] The judge found that James had received insurance proceeds between $3,200 and $3,400 to cover the repairs, but had not given the funds to Ellen to do so. Thus James actually received approximately $38,800 on account of his share of the marital residence.
[2] . This account was entirely depleted by James during the course of this litigation, allegedly to pay for accountants and lawyers for himself and Ellen, and for Matthew's Bar Mitzvah.
[3] . This account was partially depleted by James during the course of this litigation, also allegedly to pay for accountants, lawyers, and Matthew's Bar Mitzvah.
[4] We recognize that James's mother had no obligation to continue those gifts. However, after James testified that his mother continued to advance those expenses, but did so as loans rather than as gifts, the judge disbelieved James's claim that he was indebted to his mother to repay those amounts.
[5] The record does not reveal defendant's expert's total invoice or defendant's counsel fees.
[6] Defendant provided no evidence to rebut plaintiff's claim that the credit card debt was subject to equitable distribution.
[7] This is how we calculated Barson's value with the disputed discounts added back. Recall that Barson used a three-to-one weighted average of his income approach value ($266,000 after reductions by both a 25% marketability and a 15% minority discount) and his market approach value ($637,000 after reduction only by a 15% minority discount).
In order to add back both discounts to Barson's income approach
(25% for marketability and then 15% for a minority interest), the formula
is:
.85 I (.75 I) = 266,000
 .6375 I = 266,000
 I = 417,000,
where "I" equals the undiscounted income approach value.
To add back the minority (15%) discount to Barson's market approach,
the formula is:
.85 M = 637,000
 M = 749,000,
where "M" equals the undiscounted market approach value.
Finally, the three-to-one weighted average of Barson's undiscounted
approaches to valuation is:
Income approach value I 417,000 x 3 = 1,251,000
Market approach value M749,000 x 1 = 749,000
 _________
 2,000,000
2,000,000 divided by 4 = 500,000

[8] Gilbert received the other five shares.
[9] A review of cases in other states involving valuation of shares in a closely-held corporation reveals no uniformity respecting use of minority or marketability discounts, whether in the context of statutory appraisal, corporate dissolution, or equitable distribution. Nevertheless, New Jersey's adoption of the ALI's no-discount-absent-exceptional-circumstances rule appears to be the majority position. See MacKay § 14-6(d)(2)(d) (Supp. 2001); Barry M. Wertheimer, The Shareholders' Appraisal Remedy and How Courts Determine Fair Value, 47 Duke L.J. 613, 654 (1998). For a survey of cases addressing the use of a minority discount in valuing minority interests in a statutory appraisal or dissolution action, see Christopher Vaeth, Propriety of Applying Minority Discount to Value of Shares Purchased by Corporation or its Shareholders From Minority Shareholders, 13 A.L.R. 5th 840 (1993).
[10] There is a restriction on the transfer of shares to any non-family member. There is also a buy-sell agreement requiring that in the event of the death of Richard or James, the survivor is to purchase the shares of the decedent at a price to be periodically agreed upon or, in default of a current agreement, at a price to be negotiated. In the event of Gilbert's death, Richard and James are to purchase his shares. The experts and the parties agree that the last price set forth in the agreement is not controlling, and neither expert relies upon it.

As in Bowen v. Bowen, 96 N.J. at 46-47, 473 A.2d 73, the shareholders' buy-sell agreement does "not control because it did not contemplate the circumstances when the stockholder's status with the corporation and his fellow stockholders was to remain the same."
[11] We do not address here a situation where the spouses together are the sole shareholders in a closely-held corporation subject to equitable distribution. See, e.g., Fisher v. Fisher, 568 N.W.2d 728, 731 (N.D.1997). In Fisher, the North Dakota Supreme Court rejected a wife's contention that the value of her minority interest in a family business owned with her husband should be discounted from a proportionate fraction of the corporation's agreed value, thereby increasing the share of other assets required to equalize her share of the marital estate. The Court held that the wife would be adequately protected by her statutory right to receive "fair value" for her shares.
[12] Florist has been paying rent to PRJ in an amount sufficient to cover the mortgage, which both experts agree exceeds the market value of the leasehold by $33,000 per year. Each of the experts added back $33,000 to Florist's net income for purposes of the capitalization of income approach to valuation.
[13] Williams v. Williams, 59 N.J. 229, 281 A.2d 273 (1971).