**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5604-17T1

TIMOTHY J. PETERS,

     Plaintiff-Appellant,

v.

MARSHA W. PETERS,

     Defendant-Respondent.

_____

Argued June 4, 2019 – Decided July 5, 2019

Before Judges Yannotti, Gilson and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FM-18-0237-09.

Andrew M. Shaw argued the cause for appellant (De Tommaso Law Group, LLC, attorneys; Andrew M. Shaw, on the briefs).

Melissa Marie Ruvolo argued the cause for respondent (Ruvolo Law Group, attorneys; Melissa Marie Ruvolo, of counsel and on the brief; Alyssa Engleberg, on the brief).

PER CURIAM

Plaintiff appeals from an order entered by the Family Part on July 27, 2018, which among other things, denied his motion to terminate his alimony obligation. For the reasons that follow, we reverse and remand for further proceedings.

## I.

The parties were married in August 1983, and the marriage was dissolved by a Dual Judgment of Divorce (DJOD), dated July 12, 2010. The DJOD incorporated an Equitable Distribution Agreement, and stated that the parties had agreed to binding arbitration to finalize a Matrimonial Settlement Agreement (MSA). The parties finalized the MSA on May 25, 2011. It appears, however, that the DJOD was not thereafter amended to incorporate the MSA.

The MSA provided that plaintiff agreed to pay defendant permanent alimony "on a step-down basis[.]" The MSA states that plaintiff shall pay defendant $12,000 per month from January 1, 2011 through August 1, 2014, and $11,500 per month beginning on September 1, 2014, unless a "terminating event" occurred. The MSA identifies four terminating events, one of which states: "The Wife's cohabitation with an unrelated adult in a relationship tantamount to marriage, for a period of nine months. The Wife shall be obligated to notify the Husband of the fact she is residing with an unrelated adult."

A-5604-17T1

On May 15, 2018, plaintiff filed a motion which sought, among other relief, (1) termination of alimony on the basis of defendant's cohabitation with an unrelated person for at least nine months, (2) reimbursement of previously-paid alimony, (3) immediate termination of alimony, discovery, and a plenary hearing, (4) modification of his alimony obligation based on changed circumstances, and (5) an award of attorney's fees.

In support of his motion, plaintiff submitted a certification and numerous exhibits. In his certification, plaintiff asserted that "[d]efendant has been cohabitating with an unrelated adult named [J.D.] in a relationship tantamount to marriage since as early as 2011."[1] Plaintiff attached numerous Facebook photos, which allegedly showed that since 2011, defendant has, at times, worn a diamond ring on her left-ring finger. Plaintiff claimed the ring was an engagement ring that J.D. had given to defendant.

In addition, plaintiff alleged that defendant and J.D. had comingled their finances. Plaintiff provided the court with copies of documents showing that J.D. had loaned defendant $125,250, and that defendant had provided J.D. with a mortgage on her home in Bernardsville to secure repayment of the loan.

---

[1] We use initials to identity this individual in order to protect his privacy interests.

 A-5604-17T1

Plaintiff also claimed defendant and J.D. had purchased a home together in Pennsylvania. In support of this claim, plaintiff submitted a copy of a publication called, "The Intelligencer," dated July 16, 2015, which identified defendant and J.D. as "[f]uture homeowners" in a residential community near Newtown, Pennsylvania.

The publication also quotes defendant and J.D. as stating that they chose to purchase a home in the residential community because "it included features like a full basement as well as options that we were interested in like the sunroom." Plaintiff claimed defendant resided in the home in Pennsylvania because photos of the residence, which were posted online when the home was later placed on the market for sale, allegedly showed defendant's personal items in the home, including a large leather couch, rug, desk, mirror, table, and chair.

Plaintiff also stated that he hired a private investigator (PI) to undertake surveillance of defendant on six days in July 2015. The PI's report states that on several occasions, it appeared that defendant stayed overnight at J.D.'s home in Chester, New Jersey, and at the home in Newtown, Pennsylvania. The PI also observed defendant and J.D. dine out together at restaurants with their respective children. In addition, the PI observed defendant shopping at grocery, hardware and pet stores.

A-5604-17T1

Finally, plaintiff provided the court with copies of numerous posts and photographs apparently taken from J.D.'s Facebook page, which was available publically. Plaintiff alleged these photos, which date from 2011 through April 2018, show defendant and J.D. have spent a significant amount of time with each other; traveled together to Bermuda, France, Italy, and Spain; and attended various family and social functions. Plaintiff also alleged that defendant owns a home in Florida, and she and J.D. divide their time between their properties in the northeast and Florida.

On June 14, 2018, defendant opposed plaintiff's motion and filed a cross-motion seeking the award of attorney's fees. Defendant submitted a certification in which she stated that after the divorce was finalized, she met J.D., "a widower who lived with his children in Chester[.]" She resided with her children in Bernardsville. Defendant said that less than one year into their dating relationship, J.D. bought her a diamond ring. She selected the ring and "treasured it as the beautiful gift it was." Defendant also stated that she "wear[s] [the ring] when [she] gets dressed up or when [she is] out and do[es] not want uninvited attention." In 2015, defendant moved to Florida, and J.D. moved to a townhouse in Pennsylvania. Later, J.D. moved to a home he owned in Delaware.

5

Defendant asserted that for personal reasons which she did not want to discuss, she "long ago decided that [she] do[es] not ever want to be married to" J.D. She stated that she and J.D. "never moved in together and . . . never will." Defendant asserted that at times, she and J.D. stopped seeing each other, but acknowledged that they still are "in a relationship of sorts today." She stated that she never cohabited with J.D., "much less for the nine months required to terminate [her] alimony." She also stated that she and J.D. did not have a relationship that is "tantamount to marriage in any regard."

Defendant acknowledged that her personal belongings can be seen in the photographs of J.D.'s home, but stated:

> While some items I own are seen in those pictures, it is not because I have ever lived there. When I sold my house in New Jersey, I had too many furnishings to fit into my new condo in Florida. My kids were in no position to take any of it and I was hoping that would change in the near future. At that same time, [J.D.] was moving to Delaware and he wanted to rent out the townhouse as a furnished residence.

Defendant admitted that J.D. had loaned her $125,250. She claimed, however, that J.D. loaned the monies to her so she could make a down payment on a new condominium, because the proceeds from the sale of her New Jersey home had been "held up." Defendant stated that she had repaid J.D. in full from the proceeds of the sale of her house.

6

Defendant denied she and J.D. live together in their homes in the northeast and Florida. She stated that she resides "full-time" in Florida, and J.D. occasionally visits her there, when his work permits. She asserted that J.D. visits his friends and family members who reside in Florida. She also stated that J.D. "is a companion" and she enjoys spending time with him, "but we are not and never will be in a marital-like relationship."

Plaintiff filed a reply certification. Plaintiff disputed defendant's characterization of the ring, and again stated that defendant and J.D. had purchased a home together. He noted that defendant had conceded the home was filled with her personal belongings. He also asserted that in addition to the mortgage loan, J.D. loaned defendant $2400.

Plaintiff again stated that the information he had submitted showed that defendant and J.D. have traveled extensively together and have "combined" their families. He claimed that friends, family, and children "widely recognize[]" defendant and J.D. as a couple in a marriage-like relationship. He noted that in certain Facebook posts, the parties' children and J.D.'s children refer to one another as "siblings."

Plaintiff added that defendant had not provided any documentation regarding her Florida residence. He stated that a public-records search listed the

property as one of J.D.'s prior addresses. He pointed out that since the parties finalized the MSA, he has paid defendant more than $1 million in alimony, and he claimed that during that time, defendant had been cohabiting with J.D., without notifying him, as required by the MSA. He claimed defendant had misrepresented her relationship with J.D. in an attempt to avoid the termination of alimony.

The Family Part judge heard oral arguments on July 27, 2018, and later filed an order denying plaintiff's motion in its entirety. In an accompanying opinion, the judge stated:

> The negotiated contract between the parties here is not ambiguous. The terms are clear and will be given their plain and ordinary meanings. The contract will be enforced as written. In this case, it is clear that the parties agreed that: (a) the plaintiff could not assert a cohabitation claim unless the defendant resided with an unrelated male for a period of at least nine months; and (b) the defendant had an obligation to notify the plaintiff as soon as she began to reside with an unrelated male.

Based on this interpretation of the MSA, the judge found defendant had never resided with an unrelated male and therefore, defendant did not violate the notice provision of the MSA. The judge also found that plaintiff had not established a prima facie case of cohabitation because his proofs did not suggest defendant resided with J.D. "at all, much less for nine months."

The judge also denied both parties' applications for attorney's fees. The judge examined the factors in Rule 5:3-5(c) and determined that neither party should be awarded fees. However, the judge denied defendant's request without prejudice, stating that defendant could renew the request "in the event she is required to defend a similar application." This appeal followed.

## II.

On appeal, plaintiff argues that the MSA only requires that defendant engage in "cohabitation with an unrelated male in [a] relationship tantamount to marriage." Plaintiff contends the trial court erred by interpreting the relevant language of the MSA to require "a residence in common" and should have enforced the MSA according to its terms.

We defer to the factual findings of the trial court when they are "supported by adequate, substantial, credible evidence." Fattore v. Fattore, 458 N.J. Super. 75, 83 (App. Div. 2019) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). However, "[t]he trial judge's legal conclusions, and the application of those conclusions to the facts, are subject to our plenary review. Our review of a trial court's legal conclusions is always de novo.'" Id. at 84 (quoting Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

"The basic contractual nature of matrimonial agreements has long been recognized," Pacifico v. Pacifico, 190 N.J. 258, 265 (2007) (citing Harrington v. Harrington, 281 N.J. Super. 39, 46 (App. Div. 1995)), and "judges [have] greater discretion when interpreting such agreements." Sachau v. Sachau, 206 N.J. 1, 5 (2011) (quoting Guglielmo v. Guglielmo, 253 N.J. Super. 531, 542 (App. Div. 1992)). The goal of contract interpretation is to "discern and implement the intention of the parties." Quinn v. Quinn, 225 N.J. 34, 45 (2016) (citing Pacifico, 190 N.J. at 266).

A contract "must be read as a whole, without artificial emphasis on one section, with a consequent disregard for others." Borough of Princeton v. Bd. of Chosen Freeholders of Mercer, 333 N.J. Super. 310, 325 (App. Div. 2000). In addition, a contract "should not be interpreted to render one of its terms meaningless." Cumberland Cty. Improvement Auth. v. GSP Recycling Co., 358 N.J. Super. 484, 497 (App. Div. 2003). Furthermore, in New Jersey, parties to an agreement "are . . . presumed to have contracted with reference to the existing law." Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, PC v. Lowenstein Sandler, PC, 365 N.J. Super. 241, 248 (App. Div. 2003) (alteration in original) (quoting Silverstein v. Keane, 19 N.J. 1, 13 (1955)).

A marital agreement that provides for the termination of alimony on the basis of cohabitation may be enforced if the agreement is "voluntary and consensual, based on assurances that these undertakings are fully informed, knowingly assumed, and fair and equitable." Konzelman v. Konzelman, 158 N.J. 185, 198 (1999) (citing Faherty v. Faherty, 97 N.J. 99, 107 (1984); Petersen v. Petersen, 85 N.J. 638, 642 (1981)). To constitute cohabitation, the relationship must "have stability, permanency and mutual interdependence." Id. at 202. "A mere romantic, casual or social relationship is not sufficient." Ibid.

Moreover, "cohabitation is based on those factors that make the relationship close and enduring and requires more than a common residence, although that is an important factor." Ibid. Cohabitation also

> involves an intimate relationship in which the couple has undertaken duties and privileges that are commonly associated with marriage. These can include, but are not limited to, living together, intertwined finances such as joint bank accounts, sharing living expenses and household chores, and recognition of the relationship in the couple's social and family circle.
>
> [Ibid.]

Here, the trial court erred by interpreting the relevant provision of the MSA to require that defendant reside with an unrelated adult for a period of nine months. The MSA states in pertinent part that alimony may be terminated if

11

defendant engages in "<u>cohabitation</u> with an unrelated adult in a relationship tantamount to marriage, for a period of nine months."  (Emphasis added).

However, as the Court explained in <u>Konzelman</u>, cohabitation involves an intimate relationship in which the parties "undertake[] duties and privileges commonly associated with marriage[,]" and such duties and privileges can include "living together," comingling of assets, sharing living expenses, and recognition of the relationship by those in the coupe's families and social circle. <u>See</u> <u>ibid.</u>

Thus, under <u>Konzelman</u>, in determining if a couple is engaged in a marriage-like relationship, the fact that a couple lives together may be an important consideration, but "living together" is only one factor to be considered.  <u>See</u> <u>ibid.</u>  The court may find that the couple is in an intimate relationship that is comparable to marriage, even though they live in separate residences.  <u>See</u> <u>ibid.</u>

The MSA at issue here does not state that the parties intended to deviate from the understanding of the term "cohabitation" as set forth in <u>Konzelman</u>. Significantly, the MSA does not expressly provide that in order to terminate alimony on the basis of cohabitation, defendant must "reside" with an unrelated male for a period of nine months.

Rather, the MSA states that alimony shall terminate upon defendant's "cohabitation with an unrelated adult in a relationship tantamount to marriage, for a period of nine months."  As we have explained, joint residence may be a factor in determining whether defendant has engaged in "cohabitation with an unrelated adult," but it is not expressly required by the MSA.[2]

In his decision, the Family Part judge interpreted the MSA to allow termination of alimony only if defendant resides with an unrelated adult in a marriage-like relationship for at least nine months.  The judge based this interpretation upon the provision of the MSA that requires defendant "to notify [plaintiff] of the fact she is residing with an unrelated adult."  The judge reasoned that this provision of the MSA would have no meaning unless the MSA provides for termination of alimony when defendant resides with an unrelated adult in a marriage-like relationship for at least nine months.

---

[2]  We note that under N.J.S.A. 2A:34-23(n) cohabitation "involves a mutually supportive, intimate personal relationship in which a couple has undertaken duties and privileges that are commonly associated with marriage or civil union but does not necessarily maintain a single household." (Emphasis added).  This subsection of the statute was added in 2014, but it does not modify "prior agreements executed or final orders filed before the adoption of the statutory amendments."  See Spangenberg v. Kolakowski, 442 N.J. Super. 529, 538 (App. Div. 2015) (citing L. 2014, c. 42, § 2).  The parties finalized the MSA in 2011.

A-5604-17T1

We are convinced, however, that the relevant provision of the MSA only requires defendant to notify plaintiff that she is residing with an unrelated adult. Plaintiff is therefore on notice that plaintiff may be involved in a relationship that constitutes "cohabitation," that is, a relationship that is "tantamount to marriage."

The MSA does not state that defendant's relationship will only be considered "cohabitation" if she resides with an unrelated adult for nine months in a relationship tantamount to a marriage. Moreover, the MSA provides for termination of alimony in the event of defendant's "cohabitation" with an unrelated adult for a nine-month period, which may or may not involve "living together."

III.

Plaintiff further argues that the he presented prima facie evidence of cohabitation by defendant and J.D. He therefore argues that the trial court erred by failing to schedule discovery and a plenary hearing.

A prima facie showing means "evidence that, if unrebutted, would sustain a judgment in the proponent's favor." Baures v. Lewis, 167 N.J. 91, 118 (2001). Once a party establishes a prima face case of cohabitation, the burden shifts to the opposing party to demonstrate he or she is not cohabitating. See Ozolins v.

Ozolins, 308 N.J. Super. 243, 248-49 (App. Div. 1998). If there are genuine issues of material fact, the Family Part judge can order a plenary hearing to resolve those issues. See id. at 248.

We are convinced that the Family Part judge erred by finding that plaintiff did not present a prima facie case of cohabitation. As noted, under the relevant provision of the MSA, plaintiff was not required to establish that defendant resided with an unrelated adult for nine months. Rather, plaintiff had to present evidence showing that defendant cohabited with an unrelated adult in a relationship tantamount to marriage for a nine-month period. We are convinced plaintiff presented sufficient evidence to establish a prima facie case of cohabitation under this standard.

As we stated previously, plaintiff presented evidence showing that defendant had a close, personal relationship with J.D. from some time in 2011 through 2018, which he claims is tantamount to a marriage. In her response to plaintiff's motion, defendant conceded that J.D. provided her with a diamond ring, and an inference could be drawn that this was an engagement ring or a gift indicating a romantic relationship tantamount to a marriage.

In addition, plaintiff presented evidence that defendant and J.D. purchased a home together in Newtown, Pennsylvania in 2015, and defendant's furniture

A-5604-17T1

and other personal belongings remained in the home in 2018. Plaintiff also presented evidence that defendant and J.D. may have comingled their finances.

Defendant concedes that J.D. loaned her $125,250, which she used to purchase her Florida residence. Defendant asserts, however, that she repaid the loan in full, after she sold her home in New Jersey. Plaintiff also submitted evidence showing that J.D. also loaned defendant $2400; evidence that the parties often traveled together; and evidence that defendant's and J.D.'s children had a close relationship and referred to each other as "siblings."

Plaintiff claims the evidence shows that defendant and J.D. have combined their families, and friends and family members view defendant's relationship with J.D. as one that is like a marriage. This evidence also may support the conclusion that defendant and J.D. have been engaged in a relationship that is tantamount to a marriage for more than nine months.

As noted previously, defendant has disputed plaintiff's allegation that she and J.D. have resided together. She admits that she had a relationship of sorts with J.D., but asserts that they are not in a relationship tantamount to a marriage. She also denies that she and J.D. have comingled finances or intermingled their families. However, as plaintiff notes, defendant has other information that may be relevant to his cohabitation claim, and plaintiff was not afforded the

16

opportunity for discovery.  See Rose v. Csapo, 359 N.J. Super. 53, 61-62 (Ch. Div. 2002) (noting that cohabiting party and paramour have the financial and personal information necessary for the court to make a finding of cohabitation).

We therefore conclude plaintiff has presented sufficient evidence to establish a prima facie case of cohabitation, which may warrant termination of alimony pursuant to the MSA.  We therefore remand the matter to the Family Part for further proceedings on plaintiff's motion to terminate alimony on the basis of cohabitation.

On remand, the court shall afford the parties an opportunity for discovery. In addition, if there are genuine issues of material fact, the court shall conduct a plenary hearing and thereafter make the necessary findings of fact and conclusions of law.

### IV.

Plaintiff further argues that the trial court erred by denying his motion for an award of attorney's fees.  Plaintiff contends the court should have reserved a decision on his application for attorney's fees until after the parties had been afforded the opportunity for discovery, and the court has conducted a plenary hearing on his motion.  Since we have determined that the matter must be remanded for further proceedings, we need not address these arguments.

17

Plaintiff can renew his motion for an award of counsel fees after the completion of the remand proceedings.

V.

Plaintiff also argues that if the matter is remanded, the court should direct that the remand proceedings be handled by another judge. Plaintiff asserts that the judge who decided his motion may be committed to his factual findings. He also asserts reassignment to another judge may be warranted to avoid the appearance of bias based on the judge's prior involvement and statements regarding the parties.

"[W]e have the authority to direct that a case be assigned to a new judge upon remand." Graziano v. Grant, 326 N.J. Super. 328, 349 (App. Div. 1999) (citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 617 (1986)). However, this "authority should be sparingly exercised." Id. at 350.

The power to remand to a different judge "may be exercised when there is a concern that the trial judge has a potential commitment to his or her prior findings." Id. at 349 (citing A.W., 103 N.J. at 617). Furthermore, "[t]he mere fact that a judge has issued legal rulings or made factual findings in a case does not warrant reassignment in the event of reversal and remand." Brown v. Brown, 348 N.J. Super. 466, 493 (App. Div. 2002).

18

Based on the record before us, we see no reason to direct that the case be assigned to a different judge on remand. Here, the judge interpreted the relevant provision of the MSA and decided that plaintiff had not presented sufficient evidence to establish a prima facie case of cohabitation in light of that interpretation. However, the judge made no statements or findings, which suggest he is so committed to his earlier decision that he would not be able to conduct the remand proceedings fairly and impartially.

Reversed and remanded to the trial court for further proceedings in conformance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION