**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5348-18T1

D.C.,

     Plaintiff-Respondent,

v.

W.J.C., JR.,[1]

     Defendant-Appellant.

_____

> Argued March 4, 2020 — Decided April 13, 2020
>
> Before Judges Whipple, Gooden Brown, and Mawla.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FM-13-0573-10.
>
> Robert Hy Siegel argued the cause for appellant (Siegel Law, LLC, attorneys; Robert Hy Siegel, of counsel and on the briefs).
>
> D.C. argued the cause pro se.

PER CURIAM

---

[1] We utilize the parties' initials to protect the child's privacy. R. 1:38-3(d)(3) and (13).

Defendant W.J.C., Jr. appeals from June 21 and July 9, 2019 orders entered following a plenary hearing permitting plaintiff D.C. to remove the parties' daughter to Florida.  We affirm.

The parties divorced in 2011, following an eight-year marriage.  Two children were born of the marriage, a son in 2003 and a daughter in 2006.[2] Pursuant to their Marital Settlement Agreement (MSA), the parties agreed to joint legal custody of the children and a parenting time arrangement awarding defendant nearly equal parenting time.  The MSA stated "[n]either party shall permanently remove the children from the State of New Jersey without the written consent of the other party or the consent of the [c]ourt."

For approximately four years after the divorce the parties resided in the same town and had few, if any, parenting-time disputes.  In July 2015, plaintiff purchased a townhouse in Delray Beach, Florida, which she rented to a tenant. Plaintiff considered filing a removal application in 2015 but waited until the children were older before attempting to discuss the matter with defendant.

In June 2018, plaintiff moved to remove the parties' daughter to Florida. She certified she could not "make ends meet" in New Jersey, despite working

---

[2]  The removal dispute pertained only to the parties' daughter.  Pursuant to the son's wishes, he remained in New Jersey with defendant and a half-brother.

A-5348-18T1

two jobs, and sought to move to Florida "where [she had] investments, where the expenses [were] less, [and] where [she could] give to [the] children much more tha[n] what they have in New Jersey." In July 2018, plaintiff purchased a second home in Deerfield Beach, Florida. The mortgage payment for the home equaled the rent she paid for a two-bedroom apartment in New Jersey.

Defendant filed a cross-motion in opposition, arguing plaintiff provided no legal or factual basis for the removal and the best interests factors weighed against it. He argued a removal would endanger the parties' ability to agree and cooperate in matters relating to their children, the strong relationship and interaction defendant had with the parties' daughter, and her safety. He also argued plaintiff had not demonstrated the home environment in Florida would offer their daughter stability, and a move would disrupt her education.

Plaintiff alone moved to Florida in late August 2018, and defendant became the children's primary residential custodian. The parties attended court-ordered custody and parenting-time mediation in September 2018, which did not resolve their dispute. Defendant hired a forensic psychologist to conduct a best interests evaluation. The expert issued his report in February 2019, which the parties agreed to enter into evidence. The report concluded as follows:

> [I]t is my professional opinion that [the parties] presented compelling reasons for [the daughter] to stay

3

in New Jersey and move to Florida, respectively. [Defendant] pointed out [the child's] connections to family, including her brothers, and that he has had a close relationship with [her] until [plaintiff] relocated to Florida. [Defendant] expressed concern for [the daughter's] recent behavior (e.g., failing at school, instigating arguments, attempting to provoke him), and how it appeared to be an effort she was making to lead him to agree to the relocation. [Plaintiff] reported that she had advised [defendant] of her intent to move, with [the daughter], during January 2018. She indicated she felt like [the child] was residing in a toxic environment in [defendant]'s home, and that she could offer [her] a healthier environment in Florida.

However, I have a significant concern for [the child's] credibility as it pertains to the information she reported to me about her father. She demonized him repeatedly and made him seem like he is "all bad" and a villain in this situation. While there appears to be a relational issue between [the child] and [defendant] that needs to be addressed, I do believe she has decided to behave in ways designed to facilitate her ability to relocate with her mother to Florida. In fact, I believe that [she] has acted in ways to become aversive to her father so that he gives her permission to leave for Florida. . . .

However, I also cannot ignore that [the child], who is a twelve-year-old girl, wishes to reside with her mother as she navigates through what is traditionally a difficult and turbulent time (e.g., pre-teen and teenage years). She feels that her mother would offer more support than her father through this time, and this appeared credible. As such, the question of [the child's] best interests does not appear able to be boiled down to a simple "relocate or do not relocate" decision and the custodial factors (to be discussed below) are equivalent

4

between the parents. This opinion is based on my expertise in clinical and forensic psychology, my review of N.J.S.A. 9:2-4(c), and all data from the observation process.

Both parties and defendant's expert testified at the plenary hearing. Based on the testimony, the trial judge issued a March 20, 2019 order which in pertinent part stated:

> 1. The parties shall return on June 7, 2019 at 3:30 pm. [The child] shall attend with the parties.
>
> 2. [The child] shall bring to court attendance sheets and grades from [her] [e]lementary [s]chool that show her consistent attendance at school and an improvement in her grades showing As and Bs.
>
> 3. [The child] shall continue to attend therapy.
>
> 4. The parties shall attend a three-way meeting with [defendant's expert] before June 7, 2019 to discuss parenting time between the parties and [the child].

In April 2019, the parties attended another mediation without success. In June 2019, defendant's expert issued a supplemental report in which he noted the parties' daughter improved some of her grades and attendance, but "much more work needs to be done." He elaborated that

> [g]iven the uncertainty about the schooling plan for [the daughter] in Florida and the fact that she does not appear to be fully stabilized (e.g., passing all her classes, earning . . . grades of at least As and Bs as per the [c]ourt's March 20, 2019 [c]ourt order), I cannot, at

this time, support any change in the status quo regarding [the child's] living arrangements. . . .

The judge also conducted a lengthy interview with the parties' daughter in June. The child explained in detail why she wanted to live with plaintiff. She described residing with defendant as a source of "constant tension" and "constant[] fighting." She asserted defendant called her names, publicly commented about her weight and had shoved her, twisted her arm, and pulled her hair. She blamed defendant for her poor grades because she claimed his conduct "depressed [her] where [she] couldn't . . . get out of bed" and required her to see two therapists. She explained moving to Florida would enable her to "start new and fresh at a new school . . . because [she] could make new friends [and because her] best friend [was] in Florida." Additionally, she stated having more space away from defendant "would make the relationship a lot better and a lot easier."

In June 2019, the judge made the following preliminary findings:

> [The child] wants to go . . . she's talking about things like, my dad insults me . . . and I get you fight. You don't talk for a couple of days. . . . It was all very human and . . . understandable. . . .
>
> But she's . . . at an age and she wants to be with her mother . . . and her sister. She wants to be in the house of girls, not a house of guys. I'm concerned that she feels very isolated, not through any fault of

6

[defendant] . . . [b]ut I'm very concerned that she will fracture if we don't give her this opportunity.

. . . .

She was very open to the idea that if she went down to Florida for school . . . that she would . . . want to spend all the other time—and she was very astute in a lot of things she said. Like she said . . . [she felt] like if [defendant] and [she] had time apart that [their] time together would be better.

. . . .

[She] said my mother doesn't insult me, my father does. I said, give me an example. Well we walked into a restaurant and he commented on my weight to the waitress and I was mortified. And I said, well, did you tell your dad. And she said yeah I told him and he kind of laughed it off and said oh I was just kidding or something. It was a nothing incident but to a little girl, a [twelve] year old girl, who is maybe concerned about that . . . it becomes amplified. . . .

And what I'm gleaning from all that is this need for more mommy time because she's feeling she needs the comfort of her mother. She did say my mother never insults me, I feel very safe with my mother. She doesn't feel unsafe with [defendant]. She meant safe in the I'm not worried I'm going to feel bad emotionally because he said something. . . .

She said very clearly, my mother gets mad at me, my mother yells at me. And my mother disciplines me. And . . . both parents have to do that. . . .

7

So my inclination . . . is that she should go because I'm concerned that she will be isolated, feeling isolated and I think she needs mommy time.

. . . I do find that there is plenty of opportunity for her to be in New Jersey, as well. And that the issue should be about how to maximize that time as best as possible. So that she spends summers here and she spends her breaks. And she comes up any time . . . . But we have lots of Monday holidays and those kinds of things. And she could miss a day of school. And especially if you're home schooling her she can have four[-]day weekends once a month at her father's house.

The judge entered the June 21, 2019 order, granting the removal effective August 1, 2019. The order stated plaintiff would have residential custody of the parties' daughter for the school year, defendant would have parenting time from June to August each summer and both winter and spring breaks, and plaintiff would be responsible for the child's transportation costs to and from New Jersey.

On July 9, 2019, the judge set forth her final findings. The judge found defendant's expert credible but stated "I'm disagreeing with his recommendation. . . . I do not believe this [c]ourt is tethered to his opinion. . . . [A]s thoughtful and thorough as I find him to be . . . I would point out that he also did give . . . somewhat differing opinions at different stages of the proceeding." The judge found both parties credible and "[plaintiff]'s belief that there were certain breakdowns between [defendant] and [the parties' daughter],

and [defendant] having a different opinion of that, that he did not believe that there was any kind of negative interaction or breakdown in his relationship with [the child]" was "certainly persuasive." The judge stated she found

> [the child] very credible. But I certainly recognize that she's a young lady. I found her mature for her age. . . .
>
> . . . [She] certainly had a definite opinion about what she wanted. . . . She wants to go to Florida.
>
> She did give specific reasons for that, such as she doesn't feel close to her father. She feels that she is much closer . . . to her mother. She needs her mother now. Her half[-]sister, her mother's daughter from a prior relationship, is going to be there. She wants to be with that daughter—with that sister as well. And she feels that . . . she experiences a sense of abandonment when she is at her father's with her brother, that it's all boys and she's a girl, and they can't quite understand that. And she is going through a pubescent time in her life. [T]he [c]ourt recognizes that, I don't know that she said that specifically. But she did talk about this time in her life, how she feels she needs her mother.
>
> And she does, she feels she needs women around her, girls around her. And she does not feel a sense of that at her father's. I will say that that was a very powerful point that she made pretty clearly throughout.

The judge analyzed the N.J.S.A. 9:2-4(c) factors and explained in detail where she disagreed with defendant's expert and whether a given factor favored removal. The judge noted the parties' ability to agree and cooperate—was "a problem area" because "both parents accuse the other of being

9

uncommunicative," but agreed with defendant's expert there was "no evidence that the parents have had significant problems co-parenting." The judge found both parties were willing to accept custody and noted both "parents have been very forthcoming in the fact that they don't prevent the other parent from their parenting time." Addressing the child's interaction with the parties, the judge concluded she "gets along with both of her parents" and agreed with defendant's expert that her relationship with defendant would be furthered by "frequent visits to New Jersey, Skype, Facetime and social media applications would be ways of maintaining the sibling relationship." However, the judge stated:

> [T]his becomes a more important section that the [c]ourt thought a lot about. . . . [The parties' daughter] has now got herself so emotionally invested, and . . . intellectually invested in going to Florida with her mother, primarily, that it appears to be having a deteriorating effect on her relationship with her father. So much so that from the time this matter began last year . . . until I spoke with her and then even the results of her grades and things that were placed on the record in court, it appears that she is so invested in relocating with her mother . . . that she is building more negative feelings towards her father. . . .
>
> But it is an incredibly compelling concern . . . and one of the main reasons why the [c]ourt ruled that she would be allowed to relocate to Florida, because I'm also very concerned it would only get worse.
>
> We know that over the course of the last year there was evidence presented about texting . . . where

A-5348-18T1

[the child] spoke about and raised the concern about self[-]harm and suicide. And there was some texts that were presented to the [c]ourt of conversations with [the child] and [plaintiff], where she was raising these kinds of issues. And there certainly discussions between [the parties] regarding concerns about that.

. . . I was shocked that [plaintiff] would not come back when her daughter was in crisis. . . .

. . . I believed I was attempting at great length to compel [plaintiff] to come back, particularly in light of the very bad effects it was having on [the child]. Her school grades were plummeting, she was talking about possible self[-]harm. There was great concern. But [plaintiff] wants to fix that by bringing [the child] down to her, not by her coming back here. So that's her position. . . .

So I just wanted to be clear throughout this that that is a very significant point. I'm not only concerned with [the child] failing out individually, but also in her relationship with her father. That if she is forced by court order, to remain in New Jersey, as the primary residence, that it would create a deeper, . . . let's say even just start a distrust or a dislike for her own father.

And I do have a concern about a short benefit and a long term loss, you know winning the battle and losing the war as it were. [Defendant], if his daughter . . . was kept here, he may win this case, but lose his child, and certainly their relationship. And I'm concerned about her harming herself.

Whereas in the alternative, is if she goes to Florida, I believe that it would enhance her relationship with her father, because yes, we know that the child would then get "what she wants", but she does want it.

11

And not that every child should get everything they want. But we also don't have to deny them everything they want. She's very set on this resolution. And if it's not granted, I do believe there would be a very negative effect to her relationship with her father. She'll blame . . . her father because she knows he opposes it. And even when I spoke with her, as I do in all these kinds of cases, I indicated to her that this is just because her father loves her and wants to be with her.

The judge found neither domestic violence nor the safety of the child and either party were an issue. She agreed with defendant's expert the parties' daughter was "of sufficient age and capacity to reason so as to form an intelligent decision." The judge explained she disagreed with defendant's expert that allowing a relocation would send the child the wrong message by reinforcing her negative behavior. She noted although defendant's expert did "not believe it best to positively reinforce [the child's] behaviors by allowing the relocation[] [d]oesn't mean that it's not okay, it's just not best. And also he says at least at this time." The judge concluded the child was "mature enough to make [a] decision" and "at a sufficient age to make her opinion . . . known, and to just say no to her because she wants it . . . is also to disrespect her wishes."

Regarding the needs of the child, the judge stated she agreed with defendant's expert "that [the parties] have met her needs in the past" but disagreed with the expert in that defendant "does not meet her psychological

A-5348-18T1

needs of being with her mother. And that's her need right now." Regarding the stability of the home environment offered, the judge concluded "all [of the child's] needs would be met, emotionally, and physically, and psychologically, and so forth, by both parents with her living at the mother's primarily." The judge concluded both parents were fit. She found the distance between New Jersey and Florida did not prevent the removal. The judge noted Florida is easily accessible from six airports near defendant's residence and the frequency of parenting time ordered would bridge the distance between the parties' homes.

The judge also addressed the child's education, which was discussed in the supplemental expert report and raised by defendant on this appeal, namely, the order requiring the parties' daughter improve her grades and stabilize in New Jersey. Explaining her intent the judge stated:

> [W]hen I issued the order in March 2019, and I indicated that I wanted her to come showing consistent attendance at school and an improvement in her grades, she did both of those things. And then I said showing As and Bs, even when I wrote it, I said, . . . should I do that. But I was trying to impress upon her the seriousness that I . . . didn't want her to go[] for Cs and Ds[] [a]nd just pass. . . . But in reality I don't believe I thought that in that short time that she'd be able to get up to As and Bs in everything. But there was improvement.

Defendant raises the following points on this appeal:

I. THE TRIAL COURT ERRED BY FAILING TO ADEQUATELY ADDRESS THE "BEST INTERESTS" STANDARD FOR RELOCATION SET FORTH IN <u>BISBING</u>,[3] AND THE COURT ORDER ENTERED . . . ON JUNE 21, 2019 SHOULD BE VACATED, AND THE MATTER REMANDED FOR TRIAL BELOW.

II. THE TRIAL COURT ERRED BY SETTTNG PRECEDENT WHEREBY THE PARTY SEEKING RELOCATION FACES NO REPERCUSSIONS FOR PURCHASHING A NEW RESIDENCE IN ANOTHER STATE PRIOR TO TRIAL, UNILATERALLY LEAVING NEW JERSEY PRIOR TO TRIAL, AND FAILING TO RETURN TO NEW JERSEY WITH THE MINOR CHILD IN CRISIS BOTH EMOTIONALLY AND ACADEMICALLY.

III. THE TRIAL COURT ERRED BY NOT ENFORCING PLAINTIFF'S BURDEN OF ESTABLISHING A PRIMA FACIE SHOWING THAT RELOCATION TO FLORIDA WAS IN [THE CHILD'S] BEST INTERESTS.

IV. THE TRIAL COURT ERRED AND MISAPPLIED ITS DISCRETION BY INTERVIEWING [THE CHILD] IN CHAMBERS IN VIOLATION OF <u>R[ULE]</u> 5:8-6.

V. THE TRIAL COURT ERRED AND MISAPPLIED ITS DISCRETION BY NOT PROPERLY TAKING INTO ACCOUNT SUPPLEMENTAL RECOMMENDATIONS SUBMITTED BY DEFENDANT'S CUSTODY EXPERT AND SUBSTITUTING ITS OWN SUBJECTIVE VIEWS

---

[3] <u>Bisbing v. Bisbing</u>, 23 N.J. 309 (2017).

WITHOUT CREDIBLE EVIDENCE IN THE RECORD.

VI. THE TRIAL COURT ERRED AND MISAPPLIED ITS DISCRETION BY IGNORING AND CONTRADICTING THE CLEAR TERMS OF ITS OWN MARCH 20, 2019 ORDER REGARDING [THE CHILD'S] GRADES.

VII. STANDARD OF REVIEW.

"Appellate courts accord particular deference to the Family Part because of its 'special jurisdiction and expertise' in family matters." Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). "Because a trial court 'hears the case, sees and observes the witnesses, [and] hears them testify,' it has a better perspective than a reviewing court in evaluating the veracity of witnesses.'" Cesare, 154 N.J. at 412 (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)). "We do 'not disturb the "factual findings and legal conclusions of the trial judge unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice."'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (alterations in original) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). "[W]e owe no deference to the judge's decision on an issue of law or the legal consequences

that flow from established facts." Dever v. Howell, 456 N.J. Super. 300, 309 (App. Div. 2018).

In Bisbing, the Supreme Court overruled the two-part removal test in Baures and replaced it with the best-interest standard embodied in N.J.S.A. 9:2-4. 230 N.J. at 312-13. Under N.J.S.A. 9:2-2, a parent who seeks to remove a child from New Jersey without the other parent's consent must demonstrate "cause" for the removal, which is "determined by a best interests analysis in which the court will consider all relevant factors set forth in N.J.S.A. 9:2-4(c), supplemented by other facts as appropriate." Bisbing, 230 N.J. at 338. Contrary to defendant's argument, the record readily demonstrates the trial judge followed Bisbing, thoroughly addressed the statutory factors, and applied the evidence to them.

The record clearly belies defendant's argument the trial judge failed to consider the expert's supplemental report. The trial judge addressed each of the expert's reports, discussed the expert's findings, and where she agreed and differed with them. As the judge noted, she was not required to accept the expert's reasoning because her factfinding function is independent of the expert's analysis. Indeed, "[a] trial court is free to accept or reject the testimony of [an] expert, and need not adopt the opinion of [an] expert in its entirety." Brown v.

16

<u>Brown</u>, 348 N.J. Super. 466, 478 (App. Div. 2002) (citing <u>Carey v. Lovett</u>, 132 N.J. 44, 64 (1993)).

We also reject defendant's assertion the trial judge erred by not compelling a parent who moved out of state alone to return because their child remained in New Jersey in crisis. A plain reading of N.J.S.A. 9:2-2 does not dictate where a parent must reside and pertains only to minor children. Plaintiff did not abandon the parties' daughter, but instead petitioned the court for removal, left the state because she could no longer afford to reside here, and ceded custody to defendant, a joint legal custodian who historically enjoyed near-equal parenting time and presumably could address the child's needs just as well. Moreover, we discern no evidence in the record plaintiff's departure for Florida was somehow a ploy to put the parties' daughter into crisis and created the conditions for her removal. Indeed, the judge specifically addressed this assertion and concluded the reasons for plaintiff's departure were economic and the reasons for the daughter's crisis were more than her mother's absence.

For these reasons, we also reject defendant's argument, the judge improperly shifted the burden to him to set forth a prima facie case because plaintiff did not articulate a credible reason for the relocation. Defendant misreads the <u>Bisbing</u> standard. Under N.J.S.A. 9:2-2, a parent who seeks to

remove a child from New Jersey without the other parent's consent must demonstrate "cause" for the removal, which cause is analyzed through the factors of N.J.S.A. 9:2-4(c). The judge did not shift the burden of proof to defendant. The record demonstrates plaintiff established cause because the judge concluded she proved the preponderance of the statutory factors supported a removal.

Defendant claims the trial judge's interview of the parties' daughter was an abuse of discretion. He argues plaintiff "never formally requested that the trial court interview [the parties' daughter] at any point before or during trial." Both assertions are meritless. Plaintiff requested the court hear from the child as early as August 2018. Plaintiff also wrote to the judge on March 19, 2019, requesting the interview, and during testimony by defendant's expert the following day, the judge asked the expert his thoughts on the interview and the expert agreed "interviewing [the child] could help the [c]ourt arrive at the decision in this matter."

Rule 5:8-6 states: "As part of the custody hearing, the court may <u>on its own motion</u> or at the request of a litigant conduct an in camera interview with the child(ren)." (emphasis added). Additionally, in evaluating the statutory best interests factors, the judge may consider "other evidence, including . . .

interviews with the children at the court's discretion . . . ." Bisbing, 230 N.J. at 335.

The judge could interview the child without either party requesting it. The prospect of an interview was not a surprise to defendant. He did not object to the interview and did not offer any questions for the judge to ask the child when the judge invited the parties to submit them. Considering the interview yielded valuable information related to the judge's decision, including an assessment of the child's needs and sincerity, we fail to see how the decision to interview her was an error.

Finally, we reject defendant's argument the trial judge erred by ignoring and contradicting the terms of the March 2019 order regarding the child's grades. The record readily demonstrates the judge explained the order was aspirational. The judge was not beholden to the order, especially considering the subject of the order was a minor child in crisis. "'[T]he court is never irrevocably bound by its prior interlocutory ruling[.]'" Jacoby v. Jacoby, 427 N.J. Super. 109, 117 (App. Div. 2012).

When the parties reconvened in July 2019, the judge noted the goals of the March 2019 order were substantially met without the child achieving As and Bs, which the judge acknowledged was a difficult task considering the majority

of the school year had elapsed when the March order was entered. The substantial, credible evidence in the record favored removal and the decision to not literally construe the March order does not persuade us otherwise.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5348-18T1