**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0063-22

A.U.B.,[1]

    Plaintiff-Respondent,

v.

E.L.,

    Defendant-Appellant.

_____

Submitted April 17, 2024 – Decided May 7, 2024

Before Judges Currier, Firko, and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FM-04-1307-20.

Weinberg Kaplan & Smith, PA, attorneys for appellant (David M. Lipshutz, on the briefs).

Zucker Steinberg & Wixted, PA, attorneys for respondent (David Warren Sufrin, on the brief).

---

[1] We utilize the initials of the parties involved in this matter to protect their privacy and their child. R. 1:38-3(d)(3) and (13).

PER CURIAM

Defendant E.L. appeals from the Family Part's June 27, 2022 judgment of divorce (JOD) awarding her former husband, plaintiff A.U.B., sole legal and physical custody of the parties' child, S.B., born in April 2016. The judge awarded defendant parenting time on alternate weekends; prohibited the maternal grandparents from having contact with the child; and ordered defendant to engage in therapy to address various issues, including her inability to resist her parents' influence.

The judge found defendant and her parents had attempted to alienate the child from plaintiff, repeatedly made decisions that were not in the child's best interests, and orchestrated a false weapons charge against plaintiff. In addition, defendant appeals from the August 12, 2022 order denying her motion for reconsideration insofar as it restricted the maternal grandparents' access to the child.

For the reasons that follow, we affirm the decision in the JOD granting plaintiff sole legal and physical custody of S.B. However, we remand to the Family Part to modify its August 12, 2022 order to clarify the prohibition against the maternal grandparents' contact with S.B. restricts defendant from allowing

2

her parents to visit the child until her therapist provides the requisite opinion on her ability to resist their influence.

I.

We summarize the facts developed in the record. The parties married in 2014 in Virginia. They met in 2008 at an out-of-state drug recovery facility. Both parties have a history of serious substance abuse; plaintiff's sobriety dates back to 2001, and defendant's dates back to 2008. In addition to struggling with addiction, defendant has a history of traumatic events, which included being molested in kindergarten, raped while at boarding school, and being drugged and gang raped as an adult. When the parties met, defendant worked as a secretary at a university and obtained a bachelor's degree in corporate communications.

In 2013, plaintiff, who has a bachelor's degree in psychology, founded a substance use disorder treatment center. Defendant worked at the center as a therapist and later as plaintiff's executive assistant. After they got married, the parties lived out of state.

In August 2016, the parties and their infant child moved to New Jersey where plaintiff opened a treatment facility, which he sold two years later. In 2019 plaintiff began working for a substance abuse policy group, which required

him to travel once or twice a week.  Defendant was the child's primary caregiver during the parties' marriage.

Domestic Violence

The last week of January 2020, plaintiff left home for a business trip.  He was scheduled to return on February 3, 2020.  On January 28, 2020, defendant went to the police station seeking to obtain a temporary restraining order (TRO) against plaintiff.  For reasons that are not entirely clear in the record, defendant did not initially intend to report that plaintiff sexually assaulted her, but to report there was a rifle and a gun box in the attic before, it turns out, she knew it was there.  Three days later, defendant and her sister searched the attic and actually found the rifle.  They videotaped the search.  Defendant and her sister left the rifle in the attic, and defendant went away on vacation.

On February 3, 2020, defendant returned to the police station, accompanied by her sister and her mother, C.L., and sought a TRO, alleging plaintiff had sexually, physically, and emotionally abused her.  Defendant stated during her police interview that she "faked" all her orgasms "100% of the time" during the parties' sexual relations, which plaintiff later countered negated her claims of rape.  As a result of those disclosures, plaintiff was also charged criminally with a weapons offense and multiple sexual assault charges.  That

4

day, defendant obtained a TRO against plaintiff, which prohibited him from having any contact with her or the child, and barred plaintiff from the parties' home and the child's school. Defendant and her Florida treatment associates, who were also some of plaintiff's former colleagues, publicly posted the charges on social media.

At the final restraining order (FRO) hearing conducted three weeks later, defendant, who was the sole witness, testified about two incidents of rape and detailed episodes of physical and emotional abuse inflicted on her by plaintiff. After the close of the evidence, the judge awarded defendant an FRO against plaintiff and continued the restraints in the TRO. Plaintiff's motion for reconsideration was denied. We affirmed <u>E.B. v. A.B.</u>, No. A-3241-20 (App. Div. Feb. 6, 2023).

In March 2020, a grand jury charged plaintiff with first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a). He was incarcerated pending his criminal trial. The next month, plaintiff pled guilty to a reduced charge of fourth-degree criminal coercion, N.J.S.A. 2C:13-5. He was sentenced to a three-year term of probation in accordance with the plea agreement and was released on the day of

A-0063-22

his sentencing.[2]  Plaintiff was never charged or convicted of any firearms violations, and the prosecutor ultimately returned the rifle to him.

<u>Zoom Calls</u>

While plaintiff was incarcerated, defendant and the child moved out of state to where the maternal grandparents resided.  After he was released from incarceration in April 2020, plaintiff wanted to move back to the marital residence, but defendant refused his request, claiming she was only visiting her parents and would return to New Jersey.  Consequently, defendant moved into a hotel and later to an apartment where he was residing at the time of the divorce trial.

Following his release from incarceration, plaintiff began having daily Zoom calls with the child, who was not yet four years old.  Defendant initiated the Zoom calls due to the child's young age.  Many of the Zoom calls were

---

[2] On September 24, 2020, plaintiff moved to vacate his guilty plea, claiming he was "forced" to accept this plea because "[his] house was stolen, [his] child was kidnapped," the COVID-19 pandemic had begun, and a guilty plea would result in his immediate release.  The trial court denied the motion.  Plaintiff's motion for reconsideration of that order was also denied.  Plaintiff appealed from both decisions, and we affirmed.  <u>State v. A.U.B.</u>, No. A-1942-20 (App. Div. Feb. 6, 2023).

A-0063-22

recorded by both parties. Conversations were also recorded between the parties and played at the divorce trial.

The Divorce Litigation

On June 23, 2020, plaintiff filed a complaint for divorce, and defendant filed a counterclaim. Plaintiff sought sole custody. The judge conducted a non-consecutive fourteen-day trial from February 22 to May 17, 2022. The parties, one custody expert, and C.L.—who is a lawyer—testified during the trial. Plaintiff acknowledged his extensive stints in rehabilitation during his youth and his twenty-one years of sobriety. He stated he was successful in recovery after previous failures in high schools and programs, and explained his criminal record for check fraud and assaulting his drug dealer were related to his substance abuse issue.

At the time of trial, plaintiff was unemployed, which he attributed to defendant's publicizing her allegations against him and his role as a whistleblower against the "treatment industry" where he previously worked. Plaintiff testified that initially he was amenable to shared custody of the child, but he now sought sole custody because of defendant's false accusations against him and her interference with his visitation. In terms of false allegations of abuse, plaintiff stated defendant had filed "[eleven] . . . false [Division of Child

7

Protection and Permanency (Division)] complaints" against him, which always arose just before the next court date.

Plaintiff testified that in 2018, his father was moving out of the country and brought "an old .22 caliber hunting rifle" for safekeeping to the parties' New Jersey home. According to plaintiff, he did not want the gun, but accepted the rifle from his father in a locked box and never opened it. Plaintiff testified that since their child was a baby at the time, the parties agreed to send the rifle to defendant's parents, who had firearms. Plaintiff "assumed" defendant brought the rifle to her parents because he never saw it again.

Plaintiff denied the sexual assault allegations at the divorce trial, stating the parties' sexual relationship was consensual. He testified that defendant was "a trained sex worker" who clearly conveyed when she wanted to have sex. Plaintiff stated they only had anal sex if defendant initiated it, and it always stopped when she expressed any pain. Plaintiff acknowledged using profane language against defendant, but denied doing so in the child's presence.

Plaintiff presented portions of the parties' recorded conversations. In one clip from a June 20, 2020 Zoom call, plaintiff accused defendant of "orchestrat[ing] this whole thing" against him, including the weapons charge. Plaintiff presented another clip to support his assertion that the parties' sex was

8

consensual. In response to plaintiff's questions, in one clip defendant said, "a lot of it started off that way"—meaning consensual sex—but that it was "very complicated" due to their "power dynamics," which caused her to feel "subservient" and as if she "had to comply." While plaintiff acknowledged the "pressure" and "power dynamics," he denied it constituted rape.

In the other clip, the parties discussed the alleged January 28, 2020 rape incident. Defendant claimed she had pneumonia at the time, and the sex was not consensual. However, defendant also conceded she had told the police the incident was consensual. But defendant added that the police had asked her if she "wanted to," and she responded "no."

Plaintiff testified that in a recorded May 29, 2020 Zoom call, defendant pressured him to sell the marital residence and then "forced" the child to tell him that the child wanted a new home. In another recording, plaintiff told the child they were going to be "stuck" in New Jersey "forever," and the child echoed plaintiff's comments.

Plaintiff introduced several clips to demonstrate his claim of parental alienation. In a July 16, 2020 clip, plaintiff asked the child for a "virtual hug" at the end of their Zoom call, and defendant interrupted, explaining that child psychologists recommend that children not be forced to hug goodbye. Plaintiff

9

testified the child was not resisting giving him a virtual hug and did not want to end the call. In an August 6, 2020 clip, the child told plaintiff that he did not want plaintiff to "take [him] away," and plaintiff "need[ed] to stop taking our money."

Plaintiff also presented two recordings of defendant talking about circumcising the child, which plaintiff claimed was a "blackmail tactic" by her to obtain an "endless supply of money" from him. In one of these recordings, defendant made a "snip, snip" gesture with her hands after she reminded plaintiff that she had full medical "consent." In the recording, defendant then said she would not circumcise the child, but that plaintiff would have to explain this decision to the child when he became a teenager. Plaintiff testified defendant then sought a court order authorizing circumcision, which was denied.

In the second clip dated August 30, 2020, defendant stated that her therapist recommended she avoid making "any big choices"—including about circumcision—even if she had legal decision-making authority. The clip also reveals plaintiff stated defendant sought custody because of her "malignant narcissism" and that she engaged in a "cancel culture campaign against [him]."

Plaintiff testified that he was also granted supervised visits in addition to the Zoom calls. Despite being released from incarceration in April 2020,

10

plaintiff stated his in-person visits did not commence until January 2021, and lasted until April 2021, at which time he began having unsupervised parenting time.

Plaintiff testified that he attributed the delay in supervised visits to the maternal family's interference, stating he had proposed four visitation supervisors, which had to be mutually agreed upon, but the maternal family rejected them all. Plaintiff stated defendant proposed E.T. as a visitation supervisor. Plaintiff initially agreed to E.T., but withdrew his consent after he learned that defendant was romantically involved with E.T. and E.T. knew defendant's attorney.

The record shows the parties finally agreed to two visitation supervisors—R.O. and L.J. When R.O. could not supervise a visit, plaintiff unilaterally substituted him with N.D., who was not approved. Plaintiff claimed he notified defendant and C.L. of the substitution, but they objected. Plaintiff construed defendant's response as further evidence that she and C.L. "shame[d]" and "attack[ed]" anyone who "trie[d] to support [him]."

Plaintiff testified a confrontation ensued between himself and the maternal grandparents at the next visitation exchange when they demanded to know more about N.D. before allowing visitation to continue. The exchange was recorded

11

by both plaintiff and defendant's father, R.L., and played at trial. The recordings were lengthy and acrimonious. Plaintiff stated the visit was thwarted by defendant's parents even though he brought L.J., who was approved, along with N.D. to supervise.

Plaintiff testified that L.J. supervised approximately twenty visits. During one visit, L.J. found a pocket in the child's overalls that was sewn shut. Plaintiff explained that he ripped the stitching out and found a USB recording device in the pocket. Plaintiff testified that during their next visit, the child searched for the recording device in plaintiff's room so he could return it to C.L. Plaintiff stated the child was "freaking out about it for probably an hour," and submitted two clips verifying the child trying to get the recording device back from plaintiff, resulting in the child having a tantrum.

After recovering the device, plaintiff testified that he discovered it contained inadvertently recorded conversations between defendant and C.L., which he described as capturing their "campaign" against him. In one clip, plaintiff testified defendant and C.L. discussed who should take responsibility for planting the recording device if they got caught, with defendant offering to take the blame. In a second clip between defendant, C.L., and the child, after he brought home the book, "The Lorax," C.L. told the child the book was boring

A-0063-22

and "made [her] eyes bleed, it's so bad," and the child mimicked her and said he wanted to "throw [the book] away" because it would make his "brain bleed."

On the issue of alienation, plaintiff also testified that towards the end of the trial, defendant's parents instructed the child's school not to allow plaintiff's parents to pick him up. Plaintiff added that defendant had "perjured" herself repeatedly when she: accused him of rape and domestic violence; described the weapon found in the home as an "assault rifle," as opposed to a hunting rifle; misrepresented that he and the child had dual citizenship in Switzerland; and denied that she had moved to her parents' home out of state.

Plaintiff initially wanted to share joint custody of the child, but at trial opposed joint custody due to defendant's actions and testified that he has not had access to the child's school, teachers, or medical records since his arrest, but admittedly never specifically asked to access this information. Plaintiff also stated that he wanted to participate in the child's therapy, but defendant had "lied" to his therapists and told them that he was not interested.

In addition to seeking sole custody, plaintiff testified he objected to C.L. having any contact with the child. Plaintiff referred to C.L. as a "racist," a "f****** monster," and a "deplorable pathetic excuse for a mother." He stated

13

C.L. should "go kidnap another grandchild" and "should rot in prison in this life and burn in hell in the next."

During cross-examination, defense counsel played two recorded conversations between the parties, where defendant expressed her fear and mistrust of plaintiff. Plaintiff answered he had been "sick," was facing pressure, and thus "acted out sexually." Plaintiff denied engaging in assaultive or violent behavior, but agreed he was manipulative. He also agreed with defendant's description that she was his "outlet for [his] rage and anger." Plaintiff testified he made these comments to take "accountability" for his behavior—referring to his frequent absences from the home and his addiction to video games and pornography—but denied that his apologies were an admission to rape.

Defendant testified that plaintiff regularly used profane and disparaging language against her in the child's presence, such as "[s]tupid bitch, whore, worthless c***, ungrateful bitch, and piece of s***." She claimed that he did not want her to work outside the home and isolated her. Defendant recounted an argument between the parties when the child was young and claimed she tried to walk away with the child. But plaintiff grabbed the child's car seat from her, pressed her against a wall, and put his hand around her throat.

A-0063-22

Describing another incident when the parties resided in Florida, defendant testified that plaintiff choked her, causing her to vomit. Defendant also stated that when she was pregnant, she had an ear infection and plaintiff had yelled at her so loudly that her ear drum "ruptured and blood came out," resulting in permanent hearing loss.

Defendant reiterated portions of the testimony she gave at the FRO hearing. In particular, defendant testified that plaintiff had raped her for "[s]everal years" during their marriage. She conceded they sometimes had consensual sex, but testified plaintiff forced her to have anal sex against her will once or twice a month, and estimated that he raped her "a significant number of times."

In one instance, defendant recalled plaintiff chased her and forced himself into the bathroom where she was hiding and raped her. Defendant stated the child walked into the bathroom and saw her crying. Defendant explained she had forgotten about this incident, but was recalling incidents of abuse through her "therapeutic process." According to defendant, the last occurrence of sexual assault took place on January 28, 2020, when plaintiff left for a business trip.

Defendant stated she believed plaintiff's abusive behavior adversely impacted their child and described him as "a functional mute" because he rarely

spoke after the parties separated. Defendant also testified the child "used to wake up every morning screaming crying" and a few weeks after plaintiff's arrest, this behavior stopped. Defendant claimed that the child sometimes imitated plaintiff by grabbing her throat.

On cross-examination, defendant acknowledged she had worked as a stripper and had engaged in sex acts for money with her employer. Defendant admitted she started to "remember" the rape because her friends triggered her memory after she spoke to them because she had "blocked it out."

Regarding the rifle, defendant testified on cross-examination that she and her sister "searched for hours" before they found it in a "green box" in the attic. Defendant claimed she knew nothing about the rifle or the green box, which, for all she knew, "could have been Christmas ornaments." Defendant denied ever having a conversation with plaintiff about the rifle and denied her father-in-law dropped it off at their prior home two years earlier. At the divorce trial, defendant testified that she "ha[d] a feeling" plaintiff obtained the rifle when patrolling on the back of a truck with the "Sandinistas."

Defendant testified that the child often presented with unexplained injuries after visits with plaintiff, but denied making any allegations to the Division or asking others to report on her behalf. While defendant stated she

16

did not think plaintiff was physically abusing the child, she thought that plaintiff "yell[ed] at him a lot" to get the child to be quiet. Plaintiff did not dispute that the child had bruises, but suggested defendant or C.L. "bruis[ed] him up themselves."

Defendant requested a joint custody award and feared that sole legal custody to plaintiff would "eliminate [her] from [the child's] life." Defendant stated she agreed to engage in parallel parenting, as suggested by the custody evaluator, Dr. Gregory M. Joseph, where each parent maintains separate parenting lanes and does not interfere in the other's parenting choices.

Defendant countered plaintiff's testimony and claimed that she shared the child's medical, dental, and educational records with him in the past. In addition, defendant testified that she had given plaintiff's contact information to the child's therapist, but plaintiff was "anti-therapist," and never returned the therapist's phone call. Defendant admitted she did not notify plaintiff that the child might have to repeat kindergarten, but claimed plaintiff was already aware of this.

Defendant acknowledged that C.L. was too involved in the litigation, but said "her intentions were good." Defendant felt she made a lot of mistakes and testified that she had brought "shame to the family," whereas C.L. was an

17

intelligent lawyer who "made a lot of good decisions in her lifetime." Defendant explained that her past mistakes harmed her relationship with C.L., and she thought following her mother's lead now would help to mend their relationship.

The record shows that a heated exchange took place between counsel for the parties during defendant's cross-examination. The judge paused the proceedings and inquired about defendant's mental health. In response, defendant listed information she had gathered on plaintiff, his family, and his attorney.

C.L. testified about a phone call between plaintiff and the child where plaintiff talked about the child being kidnapped and commented that C.L. was "bad." C.L. testified that plaintiff repeatedly accused her and her husband of kidnapping the child. C.L. acknowledged she had sewn the recording device in the child's clothing, but testified she did so out of concern for him. C.L. denied asking the child to retrieve the device from plaintiff.

Dr. Joseph, a psychologist, prepared an evaluation, interviewed the parties, the child, the maternal grandparents, and defendant's therapists. In his report, Dr. Joseph opined that defendant was a nurturing and communicative parent, but noted she "struggled to effectively assert appropriate authority" and

18

appeared stressed by the child's anger and defiance, choosing to negotiate and compromise rather than set firm limits.

At trial, Dr. Joseph concluded that defendant presented with "ongoing Post-Traumatic Stress Disorder symptoms" and persecutory ideation. Dr. Joseph opined that defendant's past traumatic experiences—unrelated to plaintiff—impaired her "perceptions, emotional regulation, and impulse control," resulting in a tendency to "overperceive" and "overreact to" danger and harm, both in terms of her and the child's safety.

Dr. Joseph explained that defendant's therapists felt pressured by her to call the Division on three occasions to report: (1) emotional abuse because plaintiff had discussed the litigation with the child; (2) red marks on the child's legs, which the child said could be bug bites; and (3) the child's comments that plaintiff had "squished" him, which the Division concluded was a tight hug. None of these allegations were substantiated by the Division.

Dr. Joseph concluded that the abuse allegations were unsupported by any evidence, and reflected defendant's negative perception of plaintiff. Dr. Joseph observed that defendant was "virtually incapable" of viewing any interaction between plaintiff and the child as safe or positive. Based upon a conversation Dr. Joseph reviewed between defendant and C.L. from the recording device, he

found it was "their conviction that [plaintiff] is this dangerous person that's going to harm the child" and their "find[ing] ways to take him out of [the child's] life."

Dr. Joseph testified that defendant and her family are so "entrenched in their way of seeing things" and "on the lookout for" abuse. In support of his opinion, Dr. Joseph testified about a visitation journal that the maternal family had provided him summarizing the child's visits and calls with plaintiff. After comparing the entries to the parties' recordings, Dr. Joseph noted that the journal did not accurately reflect the recorded visits, and overly emphasized any negative aspects.

Dr. Joseph agreed that the child sometimes refused or was reluctant to speak to plaintiff, but opined this is "fairly typical" for a child his age. When the child became upset about an upcoming visit, Dr. Joseph found the maternal family made "little effort to console or encourage him," and instead, watched him have a tantrum or made comments about how it was "really sad" he had to speak to plaintiff.

Dr. Joseph reviewed the Zoom calls and interpreted them as defendant's admission that she had falsified the allegations and "orchestrated the gun charge" "to gain the upper hand in this litigation" by obtaining a TRO against

20

plaintiff.  The expert also interpreted defendant's responses about the parties' sexual relationship as an admission it was consensual and viewed defendant's behavior in the Zoom calls as contradictory of her claim that she was a victim of sexual abuse and feared plaintiff.

Dr. Joseph opined defendant lacked confidence and was "very influenced" by C.L., who was "overzealous" and "calling the shots," with defendant "following rather than leading."  He viewed C.L.'s comments about "The Lorax" as "damaging," noting the child "cherished" the book and wanted to share it with plaintiff, but C.L.'s actions "interfered with their connection on that level."  Dr. Joseph noted the recording device—and the child's attempt to retrieve it—as another example of the child being "bandied about in the case."

Regarding plaintiff's parenting style, Dr. Joseph described it as having "high nurturance, communication, and control."  Dr. Joseph observed plaintiff was "attentive to [the child's] needs," but gave him "greater latitude to explore and express himself" than defendant.  According to Dr. Joseph, plaintiff was "more demonstrative and authoritative" with the child when he struggled with frustration and defiant behaviors.

Dr. Joseph found plaintiff was "surprisingly hopeful and determined" about the litigation, with "good control of his emotions and solid frustration

21

tolerance." He criticized plaintiff for sharing too much information about the litigation with the child, but noted plaintiff did so in response to the child's questions. Dr. Joseph opined that some of plaintiff's comments were "unhealthy" and "inappropriate," specifically referencing a recording about killing defendant's attorney, but explained that plaintiff's "motivation [was] different" because he was frustrated and attempting to explain the litigation.

Dr. Joseph noted plaintiff's psychological testing profile revealed "persecutory ideation" about his belief that he had been "framed," and it was not "unreasonable" for plaintiff to fear defendant would continue to make false child abuse allegations against him.

Dr. Joseph spoke with the child separately and in bonding sessions with both parties. The expert described the child as very aware of the parties' conflict evidenced by his repeated references to lawyers and jail. During the bonding sessions, Dr. Joseph noted the child gave lengthy, robotic monologues about the litigation, which "appeared to have been coached," and echoed defendant's own complaints. The coached statements were inconsistent with "the steady comfort, love, and affection" that he otherwise displayed for plaintiff.

Dr. Joseph recommended that the parties share legal and physical custody of the child notwithstanding his concerns of alienation by defendant and her

22

family.  However, Dr. Joseph cautioned that if defendant or her family continued interfering in the child's relationship with plaintiff, then the judge should consider "requiring supervision."  Because of the parties' behaviors, Dr. Joseph opined there was a "high risk" of the child "becoming alienated from [plaintiff]" since the child was still young and unable to separate his positive interactions with plaintiff from the negative comments he received from defendant and her family.  Dr. Joseph expressed concern that the child presented with such "polarized perception" that he could, in the future, "resist or reject contact with [plaintiff]."

Defense counsel played a few clips from the child's Zoom calls with plaintiff during Dr. Joseph's testimony.  In one call, plaintiff spoke to the child about "monsters," allegedly referring to defendant's family.  In another call, plaintiff blamed "a very bad man"—meaning defendant's attorney—for his legal problems using child-friendly and legal terms to describe his complaints.  In response, the child said, "I will get rid of that boy," referring to defendant's attorney, and plaintiff added, "I hope he dies."  When the child threatened to "kill him with guns," plaintiff interrupted and told him not to say that, but continued with his complaints against defense counsel.

A-0063-22

## The Judge's Decision

The judge rendered an oral decision on the record, which was incorporated into the JOD, granting plaintiff sole legal and physical custody of the child. The judge awarded defendant parenting time on alternate weekends. In her decision, the judge determined defendant's testimony was inconsistent and peppered with irrelevant and unrelated negative statements about plaintiff. The judge emphasized that defendant's inappropriate behavior had prompted [the judge] to interrupt the proceedings, "to see if [defendant] needed counseling or something."

In addition, the judge referred to plaintiff as a "bully" who "was in control of the litigation," highlighting his disregard for court orders to stop talking and his effort to control the presentation of the evidence. The judge described plaintiff as an "obnoxious difficult individual," who "was a jerk" to defendant and was "not a good guy," yet noted she chose to marry him and have a child with him.

The judge summarized the events that precipitated the parties' separation. The judge found that, following a dispute between the parties, defendant and her family "plotted" "to get rid of" plaintiff, "orchestrated the whole thing," and criticized defendant for failing to consider how these tactics impacted the child.

24

The judge found that defendant had "[c]learly made up" the weapons charge to "set [plaintiff] up," and rejected her testimony on this issue as "literally ma[king] no sense." The judge concluded that after defendant reported the rifle to the police, "one lie [begot] another," and it just kept snowballing," resulting in the sexual assault disclosure.

The judge said she did not "know . . . what the situation was with the sex with them" noting that defendant first said, "it was consensual, then it wasn't consensual, then it was consensual, then it wasn't consensual." Defendant "couldn't keep track of what it was," or when it happened. The judge acknowledged that defendant's allegations may have been true, but did not know this "to be a fact" because "[n]one of it was shown to [the court]." The judge also was not convinced that defendant was afraid of plaintiff, based on her demeanor in the recorded conversations.

The judge credited plaintiff's testimony that, after his release from incarceration, defendant intentionally barred plaintiff's access to the marital home and prevented his visitation with the child. The judge viewed defendant's family as "blocking [plaintiff] at every turn," including with the selection of the visitation supervisor.

25

The judge chastised both parties for recording one another and the child, and for posting their private disputes on social media. While the judge criticized plaintiff for dragging the child into the litigation and his "cross-examin[ation] of defendant and the child in the recordings, the judge gave plaintiff "the benefit of the doubt" because he was trying to defend himself against defendant's allegations. Most disturbing in the judge's view was defendant and C.L.'s decision to sew a recording device into the child's clothing, which the judge concluded was "inexcusable." The judge found "on balance" that defendant's behavior was "the worst," reasoning she and C.L. and the rest of her family had alienated the child from plaintiff.

The judge questioned Dr. Joseph's recommendation of joint custody and said she "had to do something now" due to the parties' inability to agree on anything and the judge's fear that an award of joint custody would "tear this child apart." In terms of who should be granted sole custody, the judge reviewed the fourteen statutory factors identified in N.J.S.A. 9:2-4(c), namely:

> the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other

26

parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children.

[Ibid.]

Reviewing the parties' past behaviors, the judge concluded that plaintiff was better suited to communicate and cooperate in matters relating to the child (factor one). Similarly, highlighting defendant's deficiencies as a co-parent, the judge found that plaintiff would better accept the custodial arrangement and facilitate parenting time (factor two). The judge noted that defendant lacked "the proper judgment to parent" because "she allowed other people to push her around," prioritized her disputes with plaintiff over [the child's] relationship with him, and "destroyed any chance of cooperation between the parties." The judge noted defendant's fear that plaintiff would harm the child, but found no evidence supported this fear. Instead, defendant "hurt" plaintiff's relationship with the child "every chance she got," including by making false allegation to the Division and interfering with the parental grandparents' access to the child.

With respect to the parties' interactions with the child's "parents and siblings" (factor three), the judge focused on defendant's negative behavior towards plaintiff. While defendant was child's primary caregiver, the judge stated she "systemically" took plaintiff "out of the picture" and disparaged him both publicly and privately, including in the child's presence.

The judge next considered the parties' history of domestic violence (factor four). The judge noted that defendant never alleged that plaintiff hit her or the child, and thus viewed the FRO as "a neutral restraining order situation" with respect to domestic violence and added that the FRO would protect defendant from any future harm.

While reiterating that there was no threat of physical harm to the child (factor five), the judge found that defendant's family's actions in sewing a recording device into his clothing was "completely abusive," as were their attempts to have the child retrieve the device from plaintiff. In terms of stability of the home environment (factor eight), the judge said the parent who receives sole custody of the child would also receive the marital home to ensure "the quality and continuity of his education" (factor nine).

The judge held that both parents were "minimally fit," but weighed this factor in favor of plaintiff (factor ten). Although both parties had launched

social media "campaign[s]" against one another, the court noted that defendant "started it," adding that she had "destroyed his life" with her false allegations and "reveled in it."

The judge weighed in defendant's favor the "extent and quality of time spent with the child prior to the separation" (factor twelve), as she was the child's primary caregiver. The judge also considered the parties' employment responsibilities (factor thirteen), stating that neither of them worked, thus this was "really pretty neutral on both ends." Because they had support from their respective families, the judge found that both parties were able to meet the child's needs.[3]

The judge concluded that the factors weighed in plaintiff's favor and awarded him sole legal and physical custody. The judge also ordered plaintiff to engage in anger management courses and ordered defendant to continue therapeutic counseling to help her "understand what it means to be a co-parent."

The judge also completely barred the maternal grandparents' from any contact with the child, explaining that until defendant's counselor reported "that she's able to withstand their control of her," they could not have contact with the

---

[3] The judge did not address factors six, seven, eleven, or fourteen, as they are not relevant to this case.

A-0063-22

child. The judge viewed the defendant's family's "manipulat[ion]" of this case as the biggest concern and viewed C.L. as the instigator, saying she "orchestrated the gun" with defendant, encouraged defendant to keep plaintiff in jail, and when the weapons charge proved to be insufficient, defendant's family "started with the other stuff."

Defendant moved for reconsideration of the JOD and to join C.L. as a party in the dissolution action. Plaintiff cross-moved seeking to clarify possession of the former marital home and the right of first refusal to purchase it. On August 17, 2022, the judge denied most of the relief sought in the motions. However, the judge modified the JOD to clarify visitation and phone contact and permitted plaintiff to relocate outside of the child's school district. A memorializing order was entered.

On September 8, 2022, defendant filed an emergent order to show cause seeking primary custody of the child, contending that plaintiff was relocating outside the geographic limits set forth in the August 17, 2022 order to a lesser quality school district. The application was denied, with the judge finding plaintiff had moved to an apartment in a town less than ten miles from the former marital home whose school system was ranked higher than the child's prior school. This appeal followed.

A-0063-22

On appeal, defendant argues the judge erred:

> (1) by awarding sole custody to plaintiff contrary to this State's legislative preference for shared custody and against the recommendation of Dr. Joseph, who recommended shared custody;
>
> (2) in failing to consider defendant's allegations of domestic violence and sexual abuse in the best interests analysis;
>
> (3) by not accepting as true all of the allegations set forth in the TRO based on the doctrine of collateral estoppel; and
>
> (4) in restricting the maternal grandparents' contact with the child, arguing such a prohibition exceeded the judge's authority.

## II.

Our review of a family court order is limited. See Cesare v. Cesare, 154 N.J. 394, 411 (1998). Generally, the family court's factual findings "are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 412 (citing Rova Farms Resort, Inc. v. Inv's, Ins. Co. of Am., 65 N.J. 474, 484 (1974)). The scope of appellate review of a Family Part judge's findings following a bench trial is limited. N.T.V. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015) (citing Cesare, 154 N.J. at 411).

The conclusions of Family Part judges regarding child custody "are entitled to great weight and will not be lightly disturbed on appeal." DeVita v.

31

DeVita, 145 N.J. Super. 120, 123 (App. Div. 1976) (citing Sheehan v. Sheehan, 51 N.J. Super. 276, 295 (App. Div. 1958)). Because this court recognizes "the special expertise of judges hearing matters in the Family Part," Parish v. Parish, 412 N.J. Super. 39, 48 (App. Div. 2010) (citing Cesare, 154 N.J. at 412), we will only disturb the Family Part's factual findings if "they are 'so wholly insupportable as to result in a denial of justice.'" In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms, 65 N.J. at 483-84).

An appellate court, in consequence, will only reverse the family court's conclusions if those conclusions are so "'clearly mistaken' or 'wide of the mark'" that they result in the denial of justice. Parish, 412 N.J. Super. at 48 (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). The Family Part's legal conclusions, however, are reviewed de novo. See N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 183 (2010).

"Discretionary determinations, supported by the record, are examined to discern whether an abuse of reasoned discretion has occurred." Ricci v. Ricci, 448 N.J. Super. 546, 564 (App. Div. 2017) (citing Gac v. Gac, 186 N.J. 535, 547 (2006)). An abuse of discretion occurs when a trial court's decision "rested on an impermissible basis, considered irrelevant or inappropriate factors, failed to consider controlling legal principles or made findings inconsistent with or

unsupported by competent evidence." Elrom v. Elrom, 439 N.J. Super. 424, 434 (App. Div. 2015) (internal quotation marks and citations omitted). Challenges to legal conclusions, as well as the trial court's interpretation of the law, are subject to de novo review. Ricci, 448 N.J. Super. at 565 (citing Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

III.

In claiming the judge erred in awarding plaintiff sole legal and physical custody of the child, defendant asks us to conduct a de novo review of the decision, contending that the judge's findings were insufficient and unsupported by the record. We disagree. As stated above, our review of a court's factual findings is for an abuse of discretion.

"In custody cases, it is well settled that the court's primary consideration is the best interests of the children." Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007). The focus is on the "safety, happiness, physical, mental and moral welfare" of the children. Fantony v. Fantony, 21 N.J. 525, 536 (1956). New Jersey carries a "legislative preference for custody decrees that allow both parents full and genuine involvement in the lives of their children following a divorce." Beck v. Beck, 86 N.J. at 485. To that end, N.J.S.A. 9:2-4 provides that:

> [I]t is in the public policy of this State to assure minor children of frequent and continuing contact with both parents after the parents have separated or dissolved their marriage and that it is in the public interest to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy.

Notwithstanding the preference for joint custody, "the decision concerning the type of custody arrangement [is left] to the sound discretion of the trial court[.]" Nufrio v. Nufrio, 341 N.J. Super. 548, 555 (App. Div. 2001) (quoting Pascale v. Pascale, 140 N.J. 583, 611 (1995)) (alterations in original). Thus, a court may award joint custody, sole custody with a provision for "appropriate parenting time for the noncustodial parent," or another arrangement that "the court may determine to be in the best interests of the child." N.J.S.A. 9:2-4(a) to (c). The court must also "identify on the record the specific factors that justify the arrangement." See J.G. v. J.H., 457 N.J. Super. 365, 374 (App. Div. 2019) (quoting Bisbing v. Bisbing, 230 N.J. 309, 322 (2017)).

Here, it is readily apparent the judge was cognizant of her charge to review the fourteen statutory factors under N.J.S.A. 9:2-4(c) when assessing custody. In rejecting joint custody, the judge expressed concern about the parties' acrimony and their inability to shield the child from their disputes. The judge's

finding is supported by the dozens of recordings, which demonstrate the parties' inability to protect the child from their adult conversations.

"[A] successful joint custody arrangement" can exist even where the parents disagree, so long as they are "able to isolate their personal conflicts from their roles as parents," "spar[ing]" the child from "whatever resentments and rancor the parents may harbor." Beck, 86 N.J. at 498-99. Here, the record clearly establishes that the parties were unable to exercise such restraint. As the judge appropriately found, the parties had a distrust of one another, and they repeatedly resorted to airing their disputes on social media, even after she instructed them to not do so.

The judge was well within her discretion to deviate from Dr. Joseph's recommendation of shared legal and physical custody. A factfinder is free to accept or reject, in full or in part, the opinions of qualified experts. Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002). While a custody expert's opinion "should be carefully considered by a judge when appropriate, such opinions do not relieve the trial judge from the ultimate responsibility of determining what type of custody arrangement is in the best interest of the child." D.A. v. R.C., 438 N.J. Super. 431, 454 (App. Div. 2014). This determination remains "the exclusive obligation of the trial judge." Ibid.

Moreover, Dr. Joseph recognized the difficulties shared custody would create and was "pessimistic" about its likelihood of success, particularly noting defendant's "entrenched" negative view of plaintiff. Referring to N.J.S.A. 9:2-4(c), the judge concluded that plaintiff was better suited as the primary custodial parent, and an award of sole custody was in the child's best interests. The record supports that determination, including the judge's extensive credibility findings, which are entitled to "great deference." D.A., 438 N.J. Super. at 451.

Defendant challenges the judge's overall assessment of the custody factors, contending the judge did not afford proper weight to her domestic violence and sexual assault allegations. Defendant interprets the judge's finding as contrary to the legislature's presumption that custody should be awarded to the non-abusive spouse.

However, domestic violence is just "one of several factors requiring consideration" when determining custody in a divorce proceeding. R.K. v. F.K., 437 N.J. Super. 58, 65 (App. Div. 2014). See also Terry v. Terry, 270 N.J. Super. 105, 119 (App. Div. 1994) (reversing custody award to the mother where "the only differentiating factor" was the father's concession to one act of physical abuse and his "lack of credibility in his denial of non-physical abuse"). Thus, in custody disputes within a divorce proceeding—as compared to when a

custody determination is part of a domestic violence hearing, which is governed by N.J.S.A. 2C:25-29(b)(11)—there is no "mechanical presumption" in favor of the non-offending spouse. R.K., 437 N.J. Super. at 66. The expectation is that the Family Part judge will "weigh the seriousness of the history of domestic violence against the other N.J.S.A. 9:2-4 factors." Ibid.

Here, the judge did not explicitly determine whether plaintiff raped defendant. The judge found defendant's allegations were contradictory and inconsistent, but observed there may be some truth to her claims. And, the judge did not reference the findings made by the judge who presided over the FRO hearing, but acknowledged the existence of the FRO and construed it as "a neutral restraining order situation." Saliently, the judge found the domestic violence allegations did not involve the child. Moreover, the judge considered how the domestic violence related to the child's best interests. Dr. Joseph's evaluation did not reveal the child was exposed to or aware of any domestic violence. Thus, even if defendant's allegations were true, the judge properly considered the impact of any domestic violence on the child's best interests.

A court's failure to consider a child's exposure to domestic violence may undermine its best interests analysis. See, e.g., J.D. v. M.A.D., 429 N.J. Super. 34, 45 (App. Div. 2012) (in the context of a FRO proceeding, the trial court erred

in giving temporary custody to the parent accused of the abuse, where the children witnessed the abuse and had "an inappropriate awareness of the problems between their parents").  Domestic violence is but one factor to consider.  R.K., 437 N.J. Super. at 65.  We are satisfied weighing this factor more heavily in defendant's favor would not have changed the outcome.

The judge highlighted that plaintiff was the parent better able to communicate, cooperate, and facilitate parenting time in considering factors one and two.  N.J.S.A. 9:2-4(c).  In contrast, the judge found that defendant's alienating behaviors undermined her ability to foster a relationship between plaintiff and the child.

A parent's repeated inability to co-parent and interfere with the other parent can support an award of sole legal custody to the other parent.  Nufrio, 241 N.J. Super. at 555.  See also Beck, 86 N.J. at 499 ("[W]hen the actions of [an uncooperative] parent deprive the child of the kind of relationship with the other parent that is deemed to be in the child's best interests, removing the child from the custody of the uncooperative parent may well be appropriate as a remedy of last resort.").

As Dr. Joseph explained, defendant was incapable of finding any positive element in plaintiff's relationship with the child, and her inability resulted in her

alienating behavior and interference with parenting time. And, defendant did very little to promote plaintiff's relationship with the child. According to Dr. Joseph, while the child's young age allowed him to separate his positive experiences from defendant's negative descriptions of plaintiff, there was a genuine threat that the child eventually would reject plaintiff if defendant's behavior persisted. The record supports this determination.

Referencing plaintiff's shortcomings in co-parenting and communicating, the judge ultimately concluded that defendant's deficiencies far outweighed those of plaintiff. Thus, the judge did not err in weighing factors one and two in plaintiff's favor.

When assessing whether either party posed a risk of physical harm to the child under factor five, the judge aptly concluded neither party did. However, the judge found defendant's family placed the child at risk of emotional harm. There was also support in the record for the judge's conclusion that while both parties were "minimally fit," defendant was less fit due to her purported false allegations against plaintiff, alienating behaviors, and lack of awareness of how this impacted the child under factor ten. The record supports the judge's findings and conclusions as to factors five and ten.

A-0063-22

Factor twelve was the only factor the judge weighed in defendant's favor because she was the child's primary caregiver throughout his life. However, Dr. Joseph noted—and the judge found—both parties had a warm, loving relationship with the child.

The judge performed the required best interests analysis under N.J.S.A. 9:2-4(c) and addressed all the relevant factors. Contrary to defendant's contention, the judge did not make an erroneous decision in granting sole custody to plaintiff. The judge aptly concluded, based upon the substantial credible evidence in the record, it would be in the best interests of the child for plaintiff to have sole custody. The record supports the judge's findings and conclusions, and we discern no basis to disturb the judge's decision on custody and parenting time.

## IV.

Next, for the first time on appeal, defendant argues the judge misapplied the doctrine of collateral estoppel. Defendant claims the judge allowed plaintiff to re-litigate the rape allegations underlying the FRO even though the issues were formerly adjudicated and proven by a preponderance of the evidence.

Collateral estoppel prevents the re-litigation of issues formerly adjudicated and fully disposed of. Barker v. Brinegar, 346 N.J. Super. 558, 565-

66 (App. Div. 2002). The notion of judicial efficiency prevents the duplication of lawsuits with the same issues, the same parties, and the same witnesses. Cogdell v. Hosp. Ctr. at Orange, 116 N.J. 7, 26 (1989); see also State v. Gonzalez, 75 N.J. 181, 186 (1977) (explaining that collateral estoppel bars re-litigation of any issue decided in prior action).

For collateral estoppel to apply, the issues must be identical to the ones presented in the prior proceedings, the issues must have been actually litigated in the prior proceeding, the court must have entered a final judgment, the issues raised in the new complaint must have been essential to the prior judgment, and the party against whom collateral estoppel is asserted must have been a party in the earlier proceeding. Olivieri v. YMF Carpet, Inc., 186 N.J. 511, 521 (2006).

Here, collateral estoppel did not prevent the judge from re-hearing testimony and re-deciding issues that were discussed in the FRO hearing. In L.T. v. F.M., 438 N.J. Super. 76, 86-89 (App. Div. 2014), we declined to give preclusive effect to an FRO hearing in a civil action based on the same allegations because of the procedural differences between the two proceedings.

In L.T., the plaintiff alleged assault in a Law Division tort case after successfully obtaining an FRO against the defendant. Id. at 81-82. The trial court applied the doctrine of collateral estoppel and barred the defendant from

41

defending against the plaintiff's allegations of assault.  Id. at 83-84.  Noting the summary nature of an FRO trial as compared to the procedure in the Law Division, and the higher standard of proof for the punitive damages sought by the plaintiff in the intentional tort action, we reversed.

Unlike the situation in L.T., here plaintiff did not testify at the FRO hearing.  Thus, the judge issuing the FRO could only make factual findings and credibility determinations based on the testimony and evidence adduced during the FRO hearing.  Here, the trial judge heard from and was able to observe both parties during the divorce trial.

In the matter under review, the evidence at the FRO hearing was largely limited to defendant's testimony against plaintiff, most likely because of the criminal case pending against him at the time.  There was no discovery or expert reports or opinions.  Therefore, plaintiff's ability to defend against defendant's allegations in the TRO was severely limited.  L.T., 438 N.J. Super. at 87-88.  In contrast, both parties testified at the dissolution hearing, presented numerous video and audio recordings to support their positions—which were made after the FRO hearing—and retained Dr. Joseph as a joint custody expert.  Our review of the record de novo convinces us the judge did not err because collateral estoppel is inapplicable here.

Finally, defendant asserts the judge erred in restricting the maternal grandparents' contact with the child on the basis it was contrary to his best interests. The JOD provides:

"[C.L.] and [R.L.] shall have no contact with the minor child at all until the [c]ourt receives a report from defendant's counselor indicating that [defendant] is capable of making decisions independent from the [maternal grandparents'] influence."

Defendant filed a motion for reconsideration, (1) arguing that the judge did not have the authority to limit the maternal grandparents access to the child because they were not parties to the litigation, and (2) asking to join the maternal grandparents to the litigation.

The judge denied her application, agreeing that the maternal grandparents were not parties to the divorce proceeding. The judge stated that the maternal "grandparents don't have any rights" except through defendant.[4] The judge also expanded on her findings for restricting the maternal grandparents' access to the child, stating "they conspired to destroy" the child's relationship with plaintiff

---

[4] The judge also mistakenly stated that "grandparents don't have any visitation rights in the State of New Jersey." See N.J.S.A. 9:72-7.1 (the grandparent visitation statute).

and defendant "was too weak" to stop them. While the judge attributed this primarily to C.L., she implicated R.L. as well, finding that the maternal grandparents "operate[d] as a unit," R.L. was present in various recordings, he was married to C.L., and he was unable to "speak up to" her. The judge found that their actions were detrimental to the child's best interests.

On appeal, defendant argues there was no evidence that the maternal grandparents conspired to destroy the child. Defendant argues any misbehavior was warranted because plaintiff had raped defendant. Defendant also questions the restriction on R.L.'s contact, given his limited role.

The Family Part has the authority "to make judgments or orders concerning care, custody, education and maintenance" of a minor child who is the subject of a custody dispute. N.J.S.A. 9:2-3. The focus of every custody and parenting time determination is "on the 'safety, happiness, physical, mental and moral welfare' of the children." Hand, 391 N.J. Super. at 105 (quoting Fantony, 21 N.J. at 536).

As articulated by our Supreme Court in Kinsella v. Kinsella, 150 N.J. 276, 317-18 (1997):

> The "best-interest[s]-of-the-child" standard is more than a statement of the primary criterion for decision or the factors to be considered; it is an expression of the court's special responsibility to safeguard the interests

44

of the child at the center of a custody dispute because the child cannot be presumed to be protected by the adversarial process.

Our courts have relied on the above cited language as authority to restrict a parent from exposing the child to a third party, if such exposure is contrary to the child's best interests. This authority is viewed as an extension of the court's parens patriae authority. DeVita v. DeVita, 145 N.J. Super. 120, 127-28 (App. Div. 1976) (citing Clemens v. Clemens, 20 N.J. Super. 383, 389 (App. Div. 1952)). Implicit in these holdings is the Family Part's authority to craft custody and parenting time in a manner that furthers the child's best interests.

While R.L.'s conduct certainly did not rise to the level of C.L.'s, the judge found both of them had assisted defendant in "orchestrating" charges against plaintiff, and both interfered with visitation, as evidenced in the recordings. Moreover, Dr. Josephs' report included an interview with R.L., who echoed defendant's and C.L.'s complaints about plaintiff as an abuser.

When reviewing a denial for reconsideration, the appellate court will affirm the trial court's decision "unless it represents a clear abuse of discretion." Kornbleuth v. Westover, 241 N.J. 289, 301 (2020) (quoting Hous. Auth. of Morristown v. Little, 135 N.J. 274, 283 (1994)). However, to the extent the trial

court's decision implicates questions of law, those legal rulings are reviewed de novo. Amzler v. Amzler, 463 N.J. Super. 187, 197 (App. Div. 2020).

Because the maternal grandparents' interfering behaviors were well documented, and Dr. Joseph expressed similar concerns about their interactions with the child, the judge's determination was supported by substantial credible evidence in the record. Thus, there was no abuse of discretion in denying defendant's motion for reconsideration.

We affirm the judge's determination to restrict C.L.'s and R.L.'s access to the child until further order of the court. However, we remand to the Family Part to enter an amended JOD to place the obligation on defendant to restrict the maternal grandparents from having access to the child until further order of the court because the maternal grandparents are not parties to this action.

To the extent we have not specifically addressed defendant's remaining claims, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0063-22